Guillermina, Blanca, Carmen María y Manuel Cintrón Salgado, demandantes y apelantes, *v.* Matilde y Mario Cintrón Salgado, incapacitado mental, representado por su tutora Aurora Álvarez, y Encarnación Álvarez, por sí y como padre con patria potestad sobre sus hijos menores Gladys Esther y Wilfredo Álvarez Cintrón, demandados y apelados.

Núm. 9921.—*Sometido:* Noviembre 15, 1949. *Resuelto:* Enero 16, 1950.

*Romany & Romany,* abogados de los apelantes; *José E. Bosch Roqué* y *Luis A. Archilla Laugier,* abogados de los apelados; *E. Márquez Huertas,* como *amicus curiae.*

El Juez Presidente Señor De Jesús emitió la opinión del tribunal.

José Cornelio Cintrón era dueño de una finca rústica compuesta de 78 cuerdas radicada en el barrio Galateo de Toa Alta y la vendió a su hija Matilde Cintrón Salgado, por escritura de 18 de agosto de 1931 y precio de $5,000. Posteriormente, por escritura de 9 de enero de 1935, Matilde segregó de la antes mencionada finca, una parcela que retuvo, compuesta de 1214 metros cuadrados, en la cual enclavaba una casa, y por la misma escritura vendió a su padre el remanente por precio de $5,000. El 6 de julio de 1943, José Cornelio Cintrón otorgó testamento abierto ante el notario Enrique Márquez Huertas en el cual instituyó herederos a sus hijos legítimos Guillermina, Blanca, Carmen María, Manuel, Matilde y Mario Cintrón Salgado, y a sus nietos, hijos de Matilde, Gladys Esther y Wilfredo Álvarez Cintrón; dejó a su hija Matilde el tercio de mejora y el tercio de libre disposición a sus referidos nietos. El mismo día en que otorgó el testamento, por escritura ante el notario Manuel Torres Reyes, José Cornelio Cintrón cedió en arrendamiento a Encarnación Álvarez, esposo de Matilde, el referido remanente de la finca de 78 cuerdas, por un término de quince años y canon de $50 mensuales. José Cornelio Cintrón falleció el 11 de noviembre de 1946 sin haber revocado el testamento y estando en vigor el contrato de arrendamiento. Cuatro años más tarde, el 18 de agosto de 1947, sus hijos Guillermina, Blanca, Carmen María y Manuel Cintrón Salgado radicaron la demanda de este pleito contra sus hermanos Matilde y

Mario Cintrón Salgado, este último incapacitado, representado por su tutora Aurora Álvarez, y contra los hijos de Matilde antes mencionados, representados por su padre con patria potestad Encarnación Álvarez. Alegaron tres causas de acción. En la primera solicitaron la nulidad del testamento por los motivos que más adelante expondremos; por la segunda que se declarase inexistente, por simulado, el contrato de compraventa celebrado entre José Cornelio Cintrón y su hija Matilde, a fin de traer al acervo de la sucesión, la parcela de 1214 metros cuadrados y la casa que la hija había segregado y retenido; y por la tercera pidieron que se declarase inexistente, por falta de causa, el contrato de arrendamiento celebrado entre José Cornelio Cintrón y su yerno Encarnación Álvarez.

Contra la sentencia que declaró sin lugar la demanda, interpusieron los demandantes el presente recurso. Consideraremos separadamente los errores relacionados con cada una de las causas de acción.

## I
### Nulidad de Testamento.

Sostienen los apelantes que el testamento es nulo porque el notario no dió fe de haberse cumplido las distintas formalidades que para el testamento abierto ordinario prescriben los artículos pertinentes de la Sección Quinta, Capítulo I, Título III, Libro Tercero del Código Civil. Una de las alegadas infracciones de esa sección[1] consiste en que el notario no dió fe de que el testador expresó su última voluntad al notario y a los testigos antes de la redacción del testamento.

En la primitiva edición del Código Civil Español, su ar-

---

[1] El artículo 649 del Código Civil, comprendido en la Sección Quinta, dispone:

"Todas las formalidades expresadas en esta sección se practicarán en un solo acto, sin que sea lícita ninguna interrupción, salvo la que pueda ser motivada por algún accidente pasajero. El notario dará fe, al final del testamento, de haberse cumplido todas las dichas formalidades y de conocer al testador o a los testigos de conocimiento en su caso."

tículo 695(²)decía, en lo pertinente: "El testador expresará su última voluntad *en presencia de los testigos y del notario.*" (Bastardillas nuestras.) Así redactado, el artículo 695 era suceptible de interpretarse en el sentido propugnado por los aquí apelantes. Pero aprovechando la oportunidad que ofrecía la Ley de 26 de mayo de 1889 que decretaba la revisión del Código, se enmendó ese artículo de suerte que, al igual que el 645(³) del nuestro, en lo que a este particular respecta, prescribe:

"El testador expresará su última voluntad al Notario y a los testigos."

Eliminadas las palabras "en presencia de los testigos y del Notario", se disipó la probabilidad de que pudiera exigirse la presencia de los testigos en el período preparatorio a la redacción del testamento. Tal requisito era contrario a

---

(²)El artículo 695 del Código Civil Español antes de su revisión, prescribía:

"El testador expresará su última voluntad *en presencia de los testigos y del Notario. Este redactará las cláusulas y las leerá en alta voz,* presentes también los testigos, para que el testador manifieste si está conforme con ellas. Si lo estuviere, firmarán el testamento todos los que sepan y puedan hacerlo, también debe consignar el notario el lugar, la hora, el día, el mes y el año del otorgamiento. Si el testador declara que no sabe o no puede firmar, lo hará por él, y a su ruego, uno de los testigos instrumentales u otra persona, dando fe de ello el Notario. Lo mismo se hará cuando alguno de los testigos no pueda firmar.

"El Notario dará siempre fe de hallarse el testador con la capacidad legal necesaria para otorgar testamento." (Bastardillas nuestras.)

(³)El artículo 645 del Código Civil de Puerto Rico prescribe:

"El testador expresará su última voluntad al notario y a los testigos. Redactado el testamento con arreglo a ella y con expresión del lugar, año, mes, día y hora de su otorgamiento, se leerá en alta voz, para que el testador manifieste si está conforme con su voluntad. Tanto el testador como los testigos podrán leer por sí mismos el testamento, debiendo el notario advertirles de éste su derecho.

"Si el testador y los testigos estuviesen conformes, será firmado en el acto el testamento por uno y por otros que puedan hacerlo.

"Si el testador declara que no sabe o que no puede firmar, lo hará por él y a su ruego, uno de los testigos instrumentales u otra persona, dando fe de ello el notario. Lo mismo se hará cuando alguno de los testigos no pueda firmar.

"El notario hará siempre constar que, a su juicio, se halla el testador con la capacidad legal necesaria para otorgar testamento."

la práctica establecida.(⁴) A este efecto dice Ramón Novoa Seoane, en el tomo 15 de la Revista de Derecho Privado, pág. 49:

"Es más: los testadores rehuyen casi siempre que intervenga más que el notario en la confesión jurídica, llamémosle así, que precede al testamento, que es el acto semisecreto en que exponen su pensamiento, y piden consejo para perfeccionarlo;..."

Exigir que en esa etapa preparatoria a la redacción del testamento se hallen presentes los testigos, equivaldría a impedir, en la mayoría de los casos, el otorgamiento de testamentos complicados que requieran gran reflexión y estudio. La unidad de acto exigida por el artículo 649 del Código Civil no principia en esta etapa preliminar, sino cuando ya redactado el testamento de acuerdo con las instrucciones del testador, el notario procede a su lectura en alta voz, en presencia del testador y testigos. Es en ese acto que el testador manifestará si el testamento que acaba de leerse está de acuerdo con su voluntad. Si así fuere, lo firmará con los testigos y el notario. Sentencias del Tribunal Supremo de España de 5 de junio de 1894 (75 J.C. 721), 6 de abril de 1896 (79 J.C. 645), 18 de junio de 1896 (79 J.C. 1242), 28 de junio de 1909 (115 J.C. 527) y 29 de diciembre de 1927 (179 J.C. 759); Manresa, Comentarios al Código Civil Español (3ra. ed. 1910) t. 5, pág. 543; F. Clemente de Diego, Instituciones de Derecho Civil Español, (ed. 1932), t. 3, pág. 66, nota 1; Castán, Derecho Civil, Común y Foral (6ta. ed. 1944) t. 4, pág. 312; Scaevola, Comentarios al Código Civil Español (ed. 1896) t. 12, págs. 422 a 423.

Como dice F. Clemente de Diego, ob. y t. cit., pág. 52, las solemnidades del testamento no deben ser más ni menos que las precisas para hacer auténtica la última voluntad. Parece claro, pues, que el notario no infringió el artículo 649 del Código Civil al no dar fe de que se hubiera llevado a cabo

---

(⁴)El Tribunal Supremo de España, en Sentencia de 18 de junio de 1896, (79 J.C. 1242), sostuvo que no era indispensable la presencia de los testigos en el período preparatorio del testamento, no obstante tratarse de uno otorgado antes de la revisión del artículo 695.

esa formalidad. En consecuencia, no erró la corte a quo al no anular el testamento por ese motivo.

 Se quejan los apelantes de que el notario tampoco dió fe: (*a*) de haberse redactado el testamento de acuerdo con la última voluntad expresada por el testador al notario y a los testigos; (*b*) de que el notario y no otra persona hubiese leído en alta voz el testamento; (*c*) de que una vez leído el testamento, el testador manifestara que su contenido es la expresión de su voluntad, ni en qué forma hiciera tal manifestación; (*d*) de que todas las formalidades se practicaron en un solo acto; (*e*) de que por lo menos uno de los testigos sabía y podía leer y escribir; y por último (*f*) que no se consignó al final del testamento la cláusula general expresiva de haberse observado todas las formalidades exigidas por la Sección Quinta, Capítulo I, Título III, Libro Tercero del Código Civil.

Para la más fácil inteligencia de la discusión que vamos a emprender, precisa tener a la vista la cláusula pertinente del testamento. Dice así:

"Y así leído en alta y clara voz este testamento que se ha verificado en un solo acto y que según dice el testador no ha otorgado antes otro, advirtiendo al testador y testigos de su derecho de leerle por sí mismos, y hallándolo todos conformes (sic) se firma por todos y de todo ello, así como del conocimiento personal de la parte y testigos y de su edad, estado, profesión y vecindad, con relación al dicho de los mismos, yo el Notario, doy fe."

El pronombre relativo "que", después de las palabras "este testamento", sin duda ha dado motivo a la tesis de los apelantes al efecto de que fué la lectura y no el testamento lo verificado en un solo acto. Ninguna duda hubiera cabido si en vez del pronombre relativo "que", después de las palabras "este testamento", se hubiera usado "el cual". Pero leyendo la totalidad de la frase: "Así leído en alta y clara voz *este testamento que se ha verificado en un solo acto y que según dice el testador no ha otorgado antes otro*", (bas-

tardillas nuestras) fácilmente advertiremos que es el testamento y no la lectura del mismo, la idea predominante en la mente del notario; y que lo verificado en un solo acto fué el testamento con todas sus solemnidades, entre las cuales se halla su lectura en alta voz. Veamos lo que sobre este particular prescribe el precepto aplicable, el artículo 645 del Código Civil:

". . . Redactado el testamento con arreglo a ella [a la voluntad del testador] . . . se leerá en alta voz, para que el testador manifieste si está conforme con su voluntad. Tanto el testador como los testigos podrán leer por sí mismos el testamento, debiendo el notario advertirles de éste su derecho.

"Si el testador y los testigos estuviesen conformes, será firmado en el acto el testamento por uno y por otros que puedan hacerlo."

Si es imprescindible para la validez del testamento abierto, que sea el notario quien lo lea en alta voz, es cuestión muy debatida entre los comentaristas del Código Civil Español. Manresa, interpretando el artículo 695 en relación con el 696 del Código Civil Español, es de opinión que la lectura del testamento en alta voz corresponde al notario. Sin embargo, añade que tanto los tratadistas como la jurisprudencia—citando la Sentencia del Tribunal Supremo de España de 4 de febrero de 1879—tienen admitido que puede leer el testamento cualquiera de los concurrentes. Ob. y t. cit., pág. 547. Y en el artículo publicado por Traviesas en la Revista de Derecho Privado, t. 22, pág. 143, tratando del testamento abierto, cita la opinión de Fernández Casado, al efecto de que como el artículo 695 sólo dice que el testamento se leerá en alta voz, sin decir quién ha de dar lectura al mismo, debe entenderse que es el notario el encargado de leerlo. Pero a continuación expone la opinión de López Gómez al efecto de que la lectura puede ser hecha por el testador, el notario o cualquiera de los testigos. Castán sostiene que de la redacción del artículo 695, en relación con el 696 y 698 del Código Civil Español, *se infiere* que dicha lectura [la

lectura en alta voz] corresponde al notario autorizante. Por último, Scaevola se expresa en los siguientes términos:

"Concluído de escribir el testamento, *se leerá* en alta voz, a fin de que el testador únicamente, manifieste si aquél está conforme con su voluntad, puesto que el Notario y los testigos han de limitarse a certificar de haber oído a dicho testador la expresada manifestación. Es indiferente que el otorgante lea por sí mismo el documento en que consigna su última disposición o que lo mande leer a otra persona, con tal que, después de la lectura, le oigan el Escribano y siempre el competente número de testigos, que ése es su testamento." Ob. y t. cit., pág. 429.

Es significativo que el artículo 695 del Código Civil Español, antes de su revisión—véase la nota 2—decía: "El testador expresará su última voluntad *en presencia de los testigos y del Notario. Éste* redactará las cláusulas y *las leerá* en alta voz", (bastardillas nuestras); y que después de la revisión dice: "El testador expresará su última voluntad al Notario y a los testigos. Redactado el testamento con arreglo a ella. . . *se leerá* en alta voz . . ." (bastardillas nuestras).

No dice dicho artículo quién deberá leer el testamento. Debemos presumir que los que revisaron el citado artículo, al variar su redacción en cuanto a la lectura del testamento concierne, no actuaron caprichosamente. Y si como es sabido, el propósito perseguido por la lectura en alta voz es que el testador y los testigos se enteren de su contenido y el primero pueda expresar si está de acuerdo con su voluntad, ¿no parece más lógica y realista la opinión de Scaevola y de López Gómez al sostener que la lectura puede ser hecha por el testador, el notario o cualquiera de los testigos?

Concedemos que el notario, en vista de esa divergencia de criterio, debió ser más explícito en lo que respecta al cumplimiento de esta formalidad. Empero, sea ello como fuere, no convenimos con los apelantes en que no aparece del testamento que la misma fuera cumplida. En el presente caso el

notario, al redactar la cláusula relativa a la lectura, siguió la letra del artículo 645. Se expresó así:

"Y así leído en alta y clara voz este testamento, . . . advirtiendo al testador y testigos de su derecho de leerle por sí mismos, y hallándolo todos conformes (sic) se firma por todos . . .".

De esta cláusula, racionalmente interpretada, se infiere que fué el notario quien leyó el testamento en alta voz y que fué él quien advirtió al testador y testigos de su derecho de leerlo por sí mismos. Parece claro que si el testador o alguno de los testigos hubiera sido quien lo leyó en alta voz, el notario no hubiera consignado después, que advirtió al testador y testigos de su derecho de leerlo por sí mismos, sino que hubiera limitado la advertencia a aquéllos que no lo hubieran leído.

■ De que una vez leído el testamento, el testador manifestó que su contenido era la expresión de su voluntad, resulta obvio de la introducción al primer párrafo del testamento, que en lo pertinente, dice: ". . . que revela que realmente se encuentra en magníficas condiciones de poder realizar este testamento en la forma *que así lo desea* y para lo cual, lo deja efectuado *de este modo, según nos indica*", (bastardillas nuestras) en relación con la cláusula final del testamento que dice: ". . . y hallándolo todos conformes (sic) se firma por todos . . .". Como dice Ramón Novoa Seoane en su citado artículo:

". . . y consignando el notario que aquél está redactado según las instrucciones del testador, y éste lo aprueba en el momento de la lectura, queda cumplido el requisito que, de todas suertes, quedaría acreditado tan sólo con la aprobación del testador al testamento leído, que con dicha aprobación no puede ser dudoso que refleja la voluntad previamente expresada, porque sin este antecedente no puede existir testamento."

■ No era necesario en este caso que el notario diera fe de que de los testigos, por lo menos uno, sabía y podía leer y escribir. El propósito de esta disposición es para cuando el testador o alguno de los testigos no sepa o no pueda fir-

mar. Scaevola, ob. y t. cit. pág. 420. En tal caso, de conformidad con el artículo 645 del Código Civil, firmará por los que no saben firmar y a su ruego, uno de los testigos instrumentales u otra persona, de lo cual el notario dará fe. Pero en el presente caso, conforme resulta del testamento, el testador y los tres testigos sabían y podían firmar y en efecto, firmaron.

█ Es verdad que al final del testamento el notario no consignó la cláusula general corriente en la redacción del testamento abierto, al efecto de que se cumplieron todas las formalidades exigidas en relación con dicho testamento. Pero dentro de las circunstancias de este caso ¿podía decirse que la omisión de esa cláusula anula el testamento? Es curioso notar la liberalidad con que el Tribunal Supremo de España, persiguiendo el propósito de que la intención del testador sea cumplida, ha interpretado estas solemnidades. Por ejemplo, el artículo 695 del Código Civil Español exige que la lectura del testamento sea en alta voz. Ello no obstante, la Sentencia del 6 de abril de 1896 (79 J. C. 645) declara que el no expresarse que el notario leyó el testamento en alta voz cuando se dice que lo leyó, no invalida el testamento, sencillamente porque debe inferirse que lo leyó en alta voz para que pudieran enterarse de su contenido los que lo autorizaron con su firma. Otro ejemplo de esa liberalidad lo encontramos en la Sentencia del mismo Tribunal, del 21 de noviembre de 1889 (88 J. C. 371).(⁵) Se trataba de un testamento en el cual interviene un testigo a quien faltaban siete meses para cumplir la edad de veintitrés años

---

(⁵) Citamos esta Sentencia como mera ilustración de lo lejos que ha ido el Tribunal Supremo de España a fin de lograr que la intención del testador no sea frustrada. Criticando dicha Sentencia ha dicho Traviesas en la Revista de Derecho Privado, tomo 22, pág. 130:

''Dudo de la legalidad de esta doctrina. Si fuese fundada, no habría razón para no aplicarla en el caso de que un heredero, de buena fe, aceptase una herencia y resultase después que el testador tenía menos de catorce años de edad o de veintirés, si el testamento era ológrafo, aunque fuese tenido generalmente como mayor de esa edad, en los respectivos supuestos. Habría que tener el testamento como válido, y eso sería inadmisible.''

exigida por el artículo 681, inciso 2, en relación con el 320 del Código Civil Español. Sin embargo, se estimó válido el testamento, considerando que ese testigo era tenido generalmente como mayor de edad, y que semejante posesión de estado, según el Tribunal Supremo de España, debe producir para los que de buena fe requieren su intervención, los mismos efectos que si realmente tuviese la edad cumplida. No cabe duda que todo notario, para evitar el menor motivo de impugnación, debe consignar esa cláusula general al final del documento. Pero el artículo 649 de nuestro Código Civil no exige el uso de una forma sacramental para expresar que se han cumplido todas las formalidades. Si como en el presente caso, del testamento resulta que cada una de ellas se ha cumplido, ¿justificaría acaso, la anulación del testamento, la circunstancia de no consignarse en el mismo, en una forma general, que esas formalidades fueron cumplidas?

 Otro alegado motivo de nulidad es la circunstancia de no haber dado fe el notario de que el testador estampó sus iniciales en cada una de las hojas del testamento.(6) Esta formalidad no está comprendida entre las exigidas por la Sección Quinta, Capítulo I, Título III, Libro Tercero del Código Civil. Ese requisito lo exige la sección 12 de la Ley para Regular el Ejercicio de la Profesión Notarial en Puerto Rico, según fué enmendada por la Ley núm. 7 de 23 de marzo de 1937, pág. 135, que en lo pertinente, prescribe:

"Las escrituras originales deberán redactarse en hojas de papel o planas. . . y en la [s] que estamparán sus iniciales los otorgantes."

La transcrita disposición no está en conflicto con las formalidades exigidas para el testamento abierto. La Ley para Regular el Ejercicio de la Profesión Notarial en Puerto Rico es supletoria de las disposiciones del Código Civil que antes

---

(6) Al final del testamento, después de las firmas del testador, testigos y del notario, pretendiendo cumplir con el artículo 12 de la Ley Notarial, el Notario extendió una nota sin firmarla, que dice:

"En todas las páginas de este testamento abierto aparecen puestas las iniciales del testador, y al final su firma con la de los testigos y la del Notario . . .".

hemos discutido.([7]) En consecuencia, en el testamento abierto, como en cualquier otra escritura, deberá cumplirse con el requisito de la transcrita sección 12. Esto no significa que las escrituras de testamento sean nulas si falta esa formalidad. La sección 20 de la Ley Notarial, taxativamente enumera en qué casos serán nulos los instrumentos públicos. Dice así:

"Serán nulos los instrumentos públicos:

"1. En que haya intervenido como parte el notario que los autorice, o contengan alguna disposición a favor de éste.

"2. En que sean testigos los parientes de las partes en ellos interesadas, o los parientes, escribientes o criados del notario autorizante.

"3. En que el notario no certifique sobre el conocimiento de los otorgantes, o no supla esta diligencia con testigos de conocimiento, o en que no aparezcan las firmas de las partes y testigos cuando deban hacerlo, y la firma, signo y rúbrica del notario."

No estando comprendida esta formalidad entre los casos de nulidad enumerados en la transcrita sección, fuerza es concluir que su omisión es una irregularidad que no anula el instrumento público.

Habiendo dispuesto de los errores señalados en relación con la primera causa de acción, pasaremos a discutir ahora los que conciernen a la segunda y tercera causas de acción.([8])

([7])La sección 22 de la Ley Notarial prescribe:

"Lo que se deja dispuesto en cuanto a la forma de los instrumentos públicos, y al número y cualidades de los testigos, y a la capacidad de adquirir lo dejado o mandado por un testador, no es aplicable a los testamentos y demás disposiciones *mortis causa,* en los cuales regirá la ley o leyes especiales del caso."

A *contrario sensu,* son aplicables a los testamentos ante notario las demás disposiciones de la Ley Notarial.

([8])No hemos mencionado la jurisprudencia de Luisiana a pesar de que los apelantes citan varios casos de aquel estado, en primer término, porque los preceptos de la ley de Luisiana pertinentes a las cuestiones discutidas no son iguales a los del Código Civil; y en segundo lugar, porque la jurisprudencia del Tribunal Supremo de España y las opiniones de los comentaristas del Código Civil Español que interpretan preceptos sustancialmente iguales a los de nuestro Código, deben tener preferencia sobre cualquier jurisprudencia interpretativa de preceptos que no son iguales a los de nuestro Código.

## II

*Inexistencia del Contrato de Compraventa
celebrado entre José Cornelio Cintrón y la
demandada Matilde Cintrón Salgado.*

Conforme hemos ya indicado, José Cornelio Cintrón vendió a su hija Matilde su finca de 78 cuerdas en el año 1931, por el precio de $5,000. La tesis de los demandantes es que Matilde Cintrón Salgado nunca tuvo bienes con los cuales pudiera comprar la referida finca; que siempre vivió con su padre, quien la mantuvo hasta que contrajo matrimonio; que después de vendida la finca a ella, estando dicha propiedad arrendada a la Cía. Azucarera del Toa, el cheque en pago del canon de arrendamiento era extendido a su nombre y que más tarde lo cambiaba y entregaba su importe a su padre, quien, según los demandantes, continuaba siendo el verdadero dueño de la finca. Para sostener esta causa de acción los demandantes presentaron el testimonio de Carmen María Cintrón, hermana de la demandada. Declaró que su padre tuvo ocho hijos, dos de los ·cuales murieron antes que él sin dejar descendencia; que su padre los sostenía y que todos vivían con él en su casa; que cuando se efectuó la supuesta venta, en el año 1931, Matilde era soltera y continuaba viviendo con su padre; que aquélla no tenía bienes ni profesión ni nunca había trabajado en empleo alguno; que la finca había sido arrendada a la Cía. Azucarera del Toa y que cuando se recibía el cheque en pago del canon de arrendamiento, era cambiado y su padre recibía el importe. Repreguntada por los demandados declaró que lo que había declarado con respecto a los cánones de arrendamiento le constaba porque la propia Matilde y su padre se lo habían dicho;[9] que en conversaciones que tuvo con su hermana Matilde en el campo, ésta le manifestó que ella cambiaba los cheques que venían de la Central y entregaba el dinero a su padre. Repreguntada nueva-

[9] Lo que le dijera el padre, a moción de los demandados y con la oposición de los demandantes, fué eliminado por la corte.

mente por los demandados declaró que fué a vivir a Nueva York en el año 1930 y desde entonces había vivido permanentemente en dicha ciudad; y a preguntas de la corte contestó que había venido a Puerto Rico tres o cuatro veces; que la última vez que vino fué en mayo de 1947 cuando ya había muerto su padre; que éste murió en noviembre de 1946; que ella vino en septiembre del mismo año y que habló con su hermana con respecto a la enfermedad del padre y entonces aquélla le dijo que ella cambiaba los cheques y le daba el dinero a su padre.

Conviene consignar que mientras declaraba esta testigo, única que se refirió a la simulación de la venta, se hallaban presentes la demandada y su esposo y ninguno de ellos ocupó la silla testifical para desmentirla. Ello no obstante, la corte declaró sin lugar esta causa de acción. El único fundamento para desestimarla fué el siguiente: "La corte entiende por el resultado de la prueba, que tales traspasos no fueron simulados. La prueba aducida por la parte demandante no le ha convencido que tales traspasos fueron en forma alguna simulados o fraudulentos. El fraude no se presume nunca."

Las cortes no pueden dejar de creer a un testigo cuya declaración no ha sido contradicha, a menos que exista un motivo razonable para no creerla. *Caballero* v. *González,* 53 D.PR. 539.

Debemos tener en cuenta que la testigo es hermana de la demandada; que toda su vida, hasta un año antes de celebrarse el supuesto contrato de compraventa, habían vivido juntas en la misma casa y eran sostenidas por su padre; y que la demandada no tenía ninguna profesión y nunca trabajó para otras personas. Si en el año 1930 la demandada era tan insolvente como declaró la testigo—y no hay duda que a ésta le constaba de propio conocimiento, pues toda su vida hasta entonces habían vivido juntas—y si consideramos su deficiente habilidad para ganar dinero, lógico es inferir en defecto de prueba en contrario, que en el año transcurrido entre el 1930 en que se marchó la testigo a Nueva York y el

1931 en que se celebró el supuesto contrato de compraventa, la demandada no pudo reunir la cantidad de $5,000, precio de la finca. Es verdad que la ley no imponía a la demandada el deber de declarar en el pleito, pero no podemos cerrar los ojos a la realidad de que ante la declaración de la testigo Carmen María Cintrón, en presencia de la demandada y su esposo, cualquier persona razonable, de ser falsa la declaración, hubiera ocupado la silla testifical para desmentirla. Aún prescindiendo de aquella parte de la declaración que se refiere a las manifestaciones que le hiciera la demandada a la testigo con relación al cobro de los cánones de arrendamiento, no vemos qué motivos pudo tener la corte inferior para sostener que tanto la venta verificada por el padre a favor de la demandada, como la verificada por ésta a favor de aquél, no fueron simuladas. No debemos perder de vista el principio bien establecido de que las transacciones entre parientes cercanos que puedan perjudicar a otras personas, deben ser examinadas con cautela. *Mackall v. Mackall,* 135 U. S. 167. Si en realidad la demandada nunca tuvo dinero alguno con qué comprar esa finca, no cabe otra conclusión que la de que no pudo existir precio cierto en la escritura de compraventa otorgada por el padre a favor de la hija. Y si la venta realizada por el padre a favor de la hija fué simulada, la escritura posterior por la cual la hija conservó para sí una parte y vendió el resto a su padre, también fué simulada. Erró, pues, la corte inferior, al no declarar con lugar la segunda causa de acción.

### III
*Contrato de Arrendamiento entre el Suegro y el Yerno.*

Las circunstancias de que el término del arrendamiento fuera de quince años; que cuando se celebró el contrato el arrendedor tuviera setenta años de edad y que ese mismo día hubiera otorgado su testamento, como cuestión de derecho no invalidan el contrato de arrendamiento. El dueño tenía perfecto derecho a arrendar su finca. Es posible que el

arrendador creyera que a pesar de sus setenta años, podía vivir hasta la terminación del arrendamiento; y el hecho de que el canon fuese más bajo de lo que hubiera podido obtener arrendando la finca a un extraño, tampoco invalida el contrato. Por consiguiente, debemos concluir que la corte inferior no erró al desestimar la tercera causa de acción.

*Procede, por lo expuesto, revocar la sentencia apelada en cuanto a la segunda causa de acción y declarar con lugar la demanda en cuanto a la misma decretando que la totalidad de la finca descrita en el párrafo segundo de la segunda causa de acción, incluyendo la parcela de 1214 metros cuadrados y casa, que se describe en el párrafo quinto de dicha causa de acción, pertenece al acervo de la herencia; y confirmarla en cuanto a la primera y a la tercera causas de acción, con imposición de costas a los demandantes sin incluir honorarios de abogado.*