Mariano Villaronga, Comisionado de Instrucción de Puerto Rico, peticionario, *v.* Tribunal de Distrito de Puerto Rico, Sección de Aguadilla, Hon. .Jesús A. González, Juez, demandado; Bernardo Feliciano, interventor.

Número 1926.

*Sometido:* 26 de agosto de 1952. *Resuelto:* 28 de enero de 1953.

332

*Hon. Procurador General Víctor Gutiérrez Franqui* y *A. Torres Branschi, Procurador General Auxiliar,* abogados del peticionario; *Benicio Sánchez Castaño* y *R. Rivero Cervera,* abogados del interventor, querellado en el pleito principal.

EL JUEZ ASOCIADO SEÑOR SIFRE emitió la opinión del tribunal.

El interventor, Bernardo Feliciano, profesor de instrucción pública, ejercía el cargo de maestro de agricultura vocacional en la Segunda Unidad Rural "La América", de la población de Lares, cuando fué suspendido de empleo y sueldo por el peticionario al formularse una querella con los cargos que transcribimos a continuación:

"1. En distintas ocasiones durante los primeros meses del año 1949, y durante el curso escolar anterior, usted, siendo maestro de instrucción pública a cargo de la enseñanza de agricultura vocacional en la Segunda Unidad Rural 'La América', de Lares, a sabiendas e intencionalmente pretendió y trató de masturbar a su discípulo Antonio Colón Ríos, tocándole y frotándole el miembro viril, produciéndole la erección del mismo, y en ocasiones intentando inducir a dicho discípulo a que cometiera con usted el infame delito contra natura. Como consecuencia de esto, el mencionado niño Antonio Colón Ríos abandonó sus estudios en febrero de 1949, permaneciendo aún fuera de la escuela.

"2. Durante los años 1945, 1946 y 1947, desempeñando el mismo cargo de maestro de instrucción pública en la misma Unidad 'La América', usted cometió con su discípulo Eliezer Ríos Monroy idénticos actos inmorales que con el anteriormente nombrado Antonio Colón Ríos.

"3. En el año 1946, y durante el curso escolar, usted cometió con su discípulo Luis Arroyo Ortiz los mismos actos inmorales

mencionados en el Cargo número 1. Este estudiante se dió de baja de las clases de agricultura vocacional que tomaba con usted.

"4. En el año 1945 usted observó la misma conducta inmoral con su discípulo Pablo Beltrán, lo cual fué causa de que este estudiante también abandonara la escuela.

"5. Desde hace mucho tiempo es general el rumor en la comarca en que ha venido usted ejerciendo como maestro de instrucción pública, que le atribuye el vicio de homosexualidad, con grave detrimento del nombre y prestigio de la escuela y con gran desasosiego de los padres de familia cuyos hijos asisten al grupo escolar bajo su dirección".

Los cargos fueron contestados por el interventor y ventilados ante un Comité de Árbitros nombrado por el peticionario. Después de haber recibido la prueba que le fuera presentada por las partes, el Comité rindió su informe al peticionario, y éste, con vista del informe y de la prueba que desfilara ante el Comité, llegó a las siguientes conclusiones comunicadas oportunamente al interventor:

"El Tribunal arbitral designado para entender en la vista administrativa de los cargos por inmoralidad formulados con fecha 1 de septiembre de 1949, contra usted, como maestro de instrucción pública, rindióme un informe completo de su actuación en el caso. Este informe demuestra que en dicha vista el tribunal dió a usted amplias oportunidades de defensa y oyó y examinó con entera imparcialidad y con actitud justiciera, toda la prueba presentada, tanto por su abogado defensor como por los fiscales. Esa prueba ha sido objeto de un minucioso y concienzudo análisis por parte del tribunal, como resultado del cual se establecen en el informe las siguientes conclusiones: *1*. Que de los cinco cargos de que consiste la querella, no han sido probados los marcados con los números 4 y 5.—*2*. Que hay en el *récord* evidencia suficiente no controvertida para dejar probado totalmente el cargo marcado con el número 1, y para dejar probados parcialmente los cargos marcados con los números 2 y 3.—*3*. Que aunque el cargo marcado con el número 5, sobre reputación moral en la comunidad, no ha sido probado y por el contrario ha desfilado ante el tribunal copiosísima prueba de defensa que abona su reputación moral, ello no llega a contrarrestar el peso de la prueba de cargo que sostienen los cargos marcados con los números 1,

2 y 3, porque es cosa innegable la posibilidad de que coexistan, en el mismo sujeto, la delincuencia y la buena reputación, especialmente tratándose de faltas extremadamente arcanas por su propia naturaleza, como las que motivan la querella. He leído detenidamente el informe, lo he estudiado con absoluta serenidad a la luz del *récord* taquigráfico y de la prueba documental que he recibido junto con el mismo, y la opinión que como consecuencia de ello he formado, concuerda plenamente con la que sustenta el tribunal arbitral. Desde la esfera en que me coloca la ley, o sea, la de juzgador con poderes para decidir la querella en definitiva, tengo, pues, ante mí un caso claro de convicción de faltas sumamentes graves, tales como las de masturbación e incitación al delito contra natura, cometidas por usted con alumnos de la unidad escolar, y de las clases en que ejercía como maestro. En esa situación, los más elementales principios de justicia y mis deberes de funcionario responsable de la suprema vigilancia de los intereses morales de la escuela y de la niñez, me señalan un curso de acción único e ineludible: el de declararle como por la presente le declaro, destituído del puesto de maestro de instrucción pública, del cual fué sumariamente y se halla en la actualidad suspendido, con los efectos consiguientes de cancelación de la licencia o de las licencias que usted posea para ejercer como tal y de cualesquiera otros pronunciamientos de ley que fueren aplicables."

De la decisión del peticionario apeló el interventor al entonces Tribunal de Distrito de Puerto Rico, Sección de Aguadilla, sosteniendo que dicha decisión era contraria a la prueba; que el peticionario había considerado prueba de referencia; que erró al apreciar la evidencia presentada; y que en toda la tramitación del caso actuó movido por pasión, prejuicio y parcialidad.

El recurso de apelación fué visto ante el tribunal sentenciador, concretándose la vista a los cargos números 1, 2 y 3. Dicho tribunal dictó resolución declarando sin lugar la querella. Pidió el peticionario la reconsideración, y estando pendiente la moción radicada a ese efecto, acudió ante este Tribunal en solicitud de *certiorari* para revisar la resolución recurrida. Denegada la reconsideración por el tribunal sentenciador, expedimos el auto.

De los ocho errores señalados por el peticionario en la solicitud de certiorari, sólo discutiremos los señalamientos cuarto y quinto, por ser innecesario discutirlos todos para la resolución del recurso. Dichos señalamientos leen así:

"(4to.) El tribunal demandado cometió error de derecho al descartar la declaración del testigo Eliezer Ríos Monroy, con relación al Cargo núm. 2, por actos realizados en los años 1945, 1946 y 1947, por el único fundamento de no haberse tomado acción oficial alguna contra el maestro Bernardo Feliciano en aquella ocasión por tales actos.

"(5to.) El tribunal demandado cometió error de derecho al descartar asímismo la declaración del testigo Luis Arroyo Ortiz, en relación con el cargo núm. 3, por el hecho de no haberse tomado acción oficial alguna contra el maestro Bernardo Feliciano hasta el año 1949, por actos realizados en 1943, y por no haberse corroborado la declaración de dicho testigo.".

■■ Los testigos Eliezer Ríos Monroy y Luis Arroyo Ortiz declararon ante el Comité de Árbitros, pero no comparecieron a declarar ante el tribunal sentenciador en la vista del recurso de apelación. En dicha vista, el peticionario, con el fin de establecer la base para presentar como prueba las declaraciones prestadas por estos testigos ante el referido Comité, solicitó que se admitiera para obrar en autos la citación expedida por el secretario del tribunal sentenciador emplazando a Ríos Monroy y Arroyo Ortiz para comparecer y declarar ante dicho tribunal, así como el certificado de diligenciamiento de la citación suscrito por persona particular y jurado ante el secretario de la Corte Municipal de Lares, en el que se hizo constar que dichos testigos estaban ausentes de Puerto Rico. El interventor se opuso a la admisión de estos documentos, sosteniendo que para probar que Ríos Monroy y Arroyo Ortiz se encontraban fuera de la Isla no bastaba con presentar el certificado de diligenciamiento, y que era necesario traer a declarar a la persona que diligenció la citación para ser repreguntada sobre las gestiones hechas para citarlos. La oposición fué desestimada y admitidos los documen-

tos. Como consecuencia de ello, y amparándose en las disposiciones del inciso 6 del artículo 397 del Código de Enjuiciamiento Civil, (¹) el peticionario presentó, para probar el Cargo núm. 2, la declaración prestada por Eliezer Ríos Monroy ante el Comité de Árbitros y, para probar el cargo núm. 3, la prestada por Luis Arroyo Ortiz ante el referido Comité. Las declaraciones fueron aceptadas en evidencia con la oposición del interventor. Este arguye ante nos, que las mismas eran inadmisibles, y que, por tanto, los señalamientos de error cuarto y quinto deben caer por su base.

El tribunal sentenciador no abusó de su discreción al admitir dichas declaraciones como parte de la prueba del peticionario. Para que pueda presentarse en juicio el testimonio de un testigo, prestado en causa anterior entre las mismas partes, y referente al mismo asunto, cuando el testigo se hallare fuera de la jurisdicción, es necesario probar que se usó de la debida diligencia para encontrarlo y citarlo, pero la suficiencia de la prueba requerida para probar ese hecho, descansa en la sana discreción del tribunal. *Welp* v. *Bogy*, 277 S.W. 600, (Mo.). La citación expedida por el secretario del tribunal sentenciador y el certificado de diligenciamiento, dieron base suficiente a dicho tribunal para hacer uso de su discreción en la forma en que lo hizo. *Welp* v. *Bogy*, supra; *Bender* v. *Bender*, 193 S.W. 294, (Mo.).

Resuelta esta cuestión, procedemos a discutir los méritos de los señalamientos cuarto y quinto. Como se ha visto, en el primero se imputa al tribunal sentenciador haber cometido error de derecho al descartar el testimonio de Eliezer Ríos Monroy, y en el segundo se le atribuye error del mismo

---

(¹) El artículo 397 del Código de Enjuiciamiento Civil (ed. 1933), en su inciso 6 (artículo 35 (6) de la Ley de Evidencia), dispone lo siguiente:

"De conformidad con las precedentes disposiciones, podrá presentarse en un juicio evidencia de los hechos siguientes:

"6. El testimonio de un testigo que hubiere fallecido, o se hallare fuera de la jurisdicción, o estuviera imposibilitado para testificar, prestado en una causa anterior entre las mismas partes, y referente al mismo asunto."

carácter al descartar el testimonio de Luis Arroyo Ortiz. En la resolución recurrida se hace el siguiente resumen de la declaración del primero de estos testigos:

"Hemos hecho un análisis cuidadoso de ese *Exhibit* y aparece que Eliezer Ríos Monroy estaba también en la misma escuela con el testigo Antonio Colón, y que allá por los años 45–46 y 47 tenía como profesor al querellado Bernardo Feliciano; que Feliciano se enamoró de él y lo dejaba en el salón, llenar libros de records y libretas. Que se le sentaba al lado, después que ordenaba a los demás estudiantes fueran a la finca; se quedaban solos y empezaba a manosearlo. Según dice el testigo, le frotaba el miembro, y que ésto sucedió *muchas veces,* por lo que tuvo que abandonar el curso de agricultura y tuvo que llamarle la atención a su padre, habiendo el papá visto al principal. Lo cambiaron de la clase de agricultura a la de Artes Industriales.

"Al preguntarle si el acto de frotarle el miembro duraba mucho tiempo, el testigo contestó: "como mi intención no era quedarme con él, me iba, y le dije que no fuera tan descarado, que mi propósito de ir a la escuela era para aprender cosas de utilidad". Que se lo dijo a su padre, al terminar su último curso escolar; que fué allá para el año 1947, que estos hechos ocurrieron en un salón y que el salón formaba parte de la Unidad. Esta es, en síntesis, la parte esencial, y la única prueba presentada por el querellante para probar el segundo cargo en este caso."

Sobre la declaración de este testigo, dice lo siguiente el tribunal sentenciador:

"Como dijimos anteriormente, hemos leído cuidadosa e íntegramente la declaración de este testigo, y hemos notado la dificultad con que se encontró la Comisión de Árbitros, con la conducta de este testigo, al extremo de que el Lcdo. Santana (Juez Asociado del Tribunal de Contribuciones de Puerto Rico) tuvo que amonestarlo, llamándole la atención fuertemente en cuanto a su modo de declarar.

"Al tribunal no le convence el testimonio de este testigo, pues no alcanza a comprender, cómo actos de esta naturaleza pueden estar llevándose a cabo muchas veces durante los años 45, 46 y 47, y que éste se lo viniera a decir a su padre a fines del curso escolar del último año, o sea del 1947.

"No creemos necesario más razonamientos, con excepción del comentario, que si los hechos ocurrieron en 1945, 1946 y 1947, y el testigo se lo comunicó a su padre y *éste a su vez al principal,*

y hubo necesidad de cambiarlo de asignatura ¿por qué entonces no se tomó la acción correspondiente, o sea, lo que se ha hecho ahora?

"Eso había ocurrido también en el año 1943 con el mismo Feliciano y el discípulo Luis Arroyo Ortiz, que comentaremos más adelante. ¿Qué hizo el Principal? Nada, que sepamos, sino cambiarlo de clase. De Agricultura a Artes Industriales. Así no se afrontaba el mal."

Pasamos a transcribir el resumen que hiciera el tribunal sentenciador del testimonio de Luis Arroyo Ortiz, así como sus comentarios sobre dicho testimonio:

"Para sostener el tercer cargo se ofreció en evidencia el testimonio de Luis Arroyo Ortiz, Ex. 'B', prestado también ante la Comisión de Árbitros, y sustancialmente y en lo pertinente es como sigue:

" 'Que conoce al profesor Bernardo Feliciano, no recuerda el número de años y fué su discípulo de agricultura en la Segunda Unidad América, y que un día estando trabajando en la agricultura, le dijo que cogiera la azada y la llevara al salón de agricultura, que iba con él—con el testigo—y por el camino lo manoseó y le cogió el b . . . y que entonces viró del camino—el testigo—y se fué a la próxima clase que era con Miss Medina y no terminó ese año la clase de agricultura y lo cambiaron para Carpintería. Que eso ocurrió una sola vez, y fué para el año 1943, que no se lo dijo a su papá, pero que se lo dijo a los niños y al principal Herminio Planell. (Ello no obstante, ni el principal ni niño alguno corroboró esto). Que Feliciano lo castigaba "como era un perverso en la escuela y por nada más (según expresó el testigo) y porque era deficiente en inglés y matemática, porque él—Feliciano el querellado—quería que los niños aprendieran" y que esto era con todos los alumnos de la escuela. Que le pegaba fuertemente porque era un perverso y hacía maldades.'

"Este testigo trató de envenenarse, y a preguntas por qué lo hizo, contestó que no sabía.

"Muy poco tenemos que comentar sobre este cargo. No sólo por lo remoto del mismo—el hecho ocurrió en el año 1943—sino porque siendo Luis Arroyo Ortiz, el único de los tres discípulos envueltos en cada uno de los cargos, que se lo comunicó, no sólo al Principal de esa escuela, Herminio Planell, sino a los niños a raíz del incidente, no se trajo corroboración alguna. Pero hay

más. De la propia declaración ofrecida en evidencia, 'Ex. B', aparece que después que Feliciano el querellado, para no confundirlo con el principal—José Feliciano—le hizo lo que declaró el testigo y 'viró del camino' se fué a la próxima clase con Miss Medina, y se lo dijo al Principal. ¿Por qué entonces no se investigó el asunto en ese momento o tan pronto como hubiere sido posible, y haber cortado el mal de raíz, si ese mal existía? Por el contrario, por motivos que ignoramos y que tampoco nos interesa, todo se calló hasta 1949, y se le hace esa imputación cerca de siete años más tarde.

"Revela algo más importante este testimonio, y es el celo del querellado en cuanto a los estudios de los niños de la escuela. Se interesaba porque estudiaran, ya nos lo dice este testigo, que Feliciano lo castigaba, porque él—el testigo—era *perverso* y nada más, porque era deficiente en inglés y matemática, y que porque Feliciano quería que 'los niños aprendieran' y que esto era con todos los alumnos de la escuela. Claro está, no comprendemos ni aplaudimos el remedio para el mal.

"Y tampoco comprendemos ni aplaudimos el remedio en boga que adoptaban las autoridades escolares cuando se quejaban estos alumnos de los alegados actos inmorales, por parte del querellado, a saber, cambiarles de asignatura. Eso no ayudaba a nadie fundamentalmente.

"Dadas esas circunstancias, y a estas alturas, no podemos con seriedad, y en bien de la justicia, considerarlo de valor alguno."

"Es significativo, y esto nos ha estado dando vueltas en nuestra mente todo el tiempo, por ser natural y de fácil comprensión, el por qué Antonio Colón Ríos y Eliezer Ríos no hubieran hecho lo que hizo Luis Arroyo Ortiz, esto es, comunicarle el hecho a los otros niños, o a su principal tan pronto ocurrieron los hechos, ya que eso es corriente entre muchachos, comentarlos, unos por jactancia y otros tal vez por repugnancia".

Cierra el tribunal a quo sus observaciones sobre el testimonio de Arroyo Ortiz manifestando que los treinta y tres años dedicados por el interventor "al servicio del gobierno en la rama educativa" no pueden ser destruídos por una prueba como la presentada por el peticionario; que debido a la naturaleza de las imputaciones hechas al interventor la evidencia para sostenerlas debe ser clara, terminante y con-

vincente; que la sometida tiene "muy poco valor evidencial", y que "la buena reputación del querellado quedó debidamente establecida" por un crecido número de testigos.

Se habrá notado, que al comentar el testimonio de Ríos Monroy, el tribunal sentenciador se refirió a "la dificultad con que se encontró la Comisión de Árbitros con la conducta de este testigo al extremo de que el Lcdo. Santana (Juez Asociado del Tribunal de Contribuciones de Puerto Rico) tuvo que amonestarlo, llamándole la atención fuertemente en cuanto a su modo de declarar".(²) En el curso de dicho testimonio, y en más de una ocasión, se le pidió a Ríos Monroy que dibujara un croquis de los edificios que integraban la Unidad Rural "La América", indicando aquél en que habían ocurrido los hechos que imputaba al interventor. Rehusó hacerlo, exponiendo como razón, que no conocía de "planos". Manifestó, sin embargo, que estaba dispuesto a declarar todo lo que sabía. Fué amonestado por el Juez Santana Becerra, pero sin lograrse que el testigo hiciera lo que se le pedía. Ríos Monroy fué sometido a severa repregunta por el abogado del interventor en cuanto a varios aspectos de su declaración. Se quejó dicho abogado que Ríos Monroy se negaba a contestar las repreguntas y pidió del Comité que se eliminara su declaración. Al denegar esta solicitud, el Juez Santana Becerra manifestó que no creía que el testigo hubiera rehusado contestar, añadiendo, "El ha declarado bien, con bastante certeza en cuanto a varios hechos".

Al referirse el tribunal sentenciador a la conducta de Ríos Monroy, no nos dice que rehusó darle crédito por ese motivo. Se limita a hacer referencia a la dificultad con que se encontró la Comisión de Árbitros en vista de su conducta, y a que fué necesario amonestarlo. Suponiendo, sin embargo, que lo manifestado por dicho tribunal deba ser interpretado en el sentido de que la conducta de dicho testigo fué una de las razones que tuvo para descartar su testimonio, esa con-

---

(¹) El Juez Santana Becerra formó parte del Comité de Árbitros.

ducta no justificaría tal conclusión, ni la inferencia de que faltó a la verdad en cuanto a los hechos esenciales sobre los cuales declaró.

■ Al tribunal sentenciador no le convenció el testimonio del testigo porque no alcanzó a comprender, "cómo actos de esta naturaleza pueden estar llevándose a cabo muchas veces durante los años 45, 46 y 47, y que esto lo viniera a decir a su padre a fines del curso escolar del último año, o sea del 1947". Ríos Monroy explicó que en este año aumentaron sus "dificultades" con el interventor, año en que fué cambiado de clase, manifestando que "lo estuve ocultando a él como maestro y también por mi padre", refiriéndose al interventor. Aparentemente el tribunal sentenciador no dió valor alguno a esta explicación. Somos de opinión, que el solo hecho de que Ríos Monroy esperara hasta fines del curso del año 1947 para informar a su padre de lo que había estado ocurriendo, no es motivo, en el orden jurídico, para descartar su testimonio, *Honselman* v. *People*, 48 N.E. 304, (Ill.). No aprobamos la actitud de Ríos Monroy al guardar silencio y no denunciar al interventor inmediatamente que se dió cuenta de lo que éste pretendía, pero creemos que merece consideración la edad del testigo cuando empezaron a suceder los hechos, su posición con relación al interventor, y las razones que dió para explicar su silencio.

■ Termina el tribunal sentenciador sus comentarios sobre la declaración de Ríos Monroy preguntando el motivo por el cual, a pesar de haber ocurrido los hechos en 1945, 1946 y 1947, no se tomó la acción oficial correspondiente cuando el testigo informó a su padre de lo que venía sucediendo y éste a su vez al principal de la escuela, lo que dió lugar a que Ríos Monroy fuera cambiado de asignatura. Si el tribunal sentenciador quiso exponer en este comentario una razón para dejar de creer el testimonio de Ríos Monroy, para nosotros es evidente que el que no se formularan cargos al interventor cuando el principal de la escuela fué informado de lo que ve-

nía ocurriendo, y que el principal se limitara a cambiar de clase al testigo, no es motivo legal para descartar el testimonio. Si los hechos ocurrieron como los relató Ríos Monroy, la circunstancia apuntada por el tribunal sentenciador no le quita el carácter de hechos realizados, ni puede usarse para evitar las consecuencias jurídicas de los mismos con respecto al interventor. No puede destruirse el valor probatorio de la declaración del testigo por causa de omisiones atribuídas a terceras personas.

■ Ninguna de las razones aducidas por el tribunal sentenciador ofrecen base legal para descartar el testimonio de Arroyo Ortiz, y exonerar al interventor. La corroboración del testigo no era requisito en un procedimiento de esta naturaleza. Que los cargos no se formularon hasta 1949 no es falta u omisión de que pueda inculparse a Arroyo Ortiz, ni base para inferir que faltara a la verdad.(3) Además, en ausencia de prueba en contrario, debe presumirse que el peticionario cumplió con su deber presentando cargos contra el interventor cuando tuvo conocimiento de los hechos.

■ Nos dice el tribunal sentenciador en sus comentarios sobre el testimonio de Arroyo Ortiz, "que las autoridades escolares" se limitaban a cambiar de asignatura a los alumnos cuando éstos se quejaban del interventor, y que esa medida no remediaba el mal ni ayudaba fundamentalmente a nadie.

De esto no puede hacerse responsable al peticionario, sobre todo, cuando no se demostró que tuviera conocimiento de lo que venía sucediendo en la Unidad Rural "La América", antes de formular cargos al interventor. En lo que respecta al testigo, es evidente que de las omisiones o errores que se atribuyen por el tribunal sentenciador a las autoridades escolares, no puede legalmente inferirse que no fuera veraz.

■ Las declaraciones de Ríos Monroy y Arroyo Ortiz no fueron controvertidas por prueba alguna. La evidencia

---

(3) El Comité, a solicitud del peticionario, permitió que se enmendara el cargo núm. 5 para reflejar que los actos imputados al interventor habían sucedido en el año 1943 y no en el 1946, como se expuso en dicho cargo.

presentada por el interventor· se limitó a refutar el cargo núm. 1, que no es objeto de discusión en esta opinión, y a demostrar su buena reputación, la que a juicio del tribunal sentenciador, quedó debidamente establecida. Nada queremos restar al valor generalmente reconocido por las cortes a la prueba de buena fama cuando ella es pertinente, pero no podemos adoptar el principio de que indefectiblemente proceda la absolución de la persona enjuiciada·por el hecho de que se pruebe que goza de buena reputación. En efecto lo estaríamos adoptando si sancionáramos la actuación de dicho tribunal al descartar las declaraciones de Ríos Monroy y Arroyo Ortiz, y al exculpar al interventor de los cargos núms. 2 y 3. Dicho principio estaría en conflicto con la doctrina firmemente establecida. de que la prueba de buena reputación no es por sí sola determinante de la inocencia de la persona inculpada, y, con la realidad anotada por el peticionario en la carta que envió al interventor cuando le destituyó del puesto de maestro de instrucción pública de que "es cosa innegable la posibilidad de que coexistan, en el mismo sujeto, la delincuencia y la buena reputación, especialmente tratándose de faltas extremadamente arcanas por su propia naturaleza, como las que motivan la querella".

 Aceptando, como sustancialmente correcto el resumen que hizo dicho tribunal de las declaraciones prestadas por Eliezer Ríos Monroy y Luis Arroyo Ortiz, nos encontramos con declaraciones de testigos no contradichos, sobre hechos específicos y determinados, que fueron descartadas y descreídas por razones que, como cuestión de derecho, no pueden servir de fundamento o base para ello, no obstante la amplia discreción y autonomía del tribunal sentenciador para apreciar y ponderar la prueba.

Los tribunales no pueden dejar de creer un testimonio no controvertido, a menos que exista un motivo razonable para no creerlo. Se presume que un testigo dice la verdad, a menos que dicha presunción sea rechazada por la forma de declarar, por el carácter de la declaración, o por evidencia que

afecte su veracidad, honradez, integridad, o móviles, o por evidencia contradictoria. Artículo 383 del Código de Enjuiciamiento Civil, ed. 1933.(4) En diversas ocasiones hemos reiterado la doctrina de que la declaración de un testigo no contradicho, sobre un hecho determinado, debe merecer crédito, a no ser que su versión sea físicamente imposible, inverosímil o que por sus contradicciones o su conducta en la silla testifical, se haga indigno de crédito. *Caballero* v. *González,* 53 D.P.R. 539; *Navarro* v. *Compañía "El Ejemplo",* 53 D.P.R. 726; *Planellas* v. *Sucn. Planellas,* 59 D.P.R. 372; *Pedraza* v. *González,* 66 D.P.R. 757; *Cintrón* v. *Cintrón,* 70 D.P.R. 770.

▇▇▇▇ Al descartar los testimonios de Ríos Monroy y Arroyo Ortiz, o sea la prueba presentada por el peticionario para sostener los cargos núms. 2 y 3, y al darle a la prueba sobre la buena fama del interventor un efecto legal que no tiene, es evidente que el tribunal a quo actuó y procedió en desacuerdo con normas y principios jurídicos que gobiernan el valor y fuerza probatoria de la evidencia, llegando erróneamente a la conclusión, con infracción de doctrina legal, que procedía exonerar de dichos cargos al interventor, conclusión que no solamente no está sostenida por prueba alguna, sí que es manifiestamente contraria a la misma, considerada ésta a la luz de las normas y principios a que hemos hecho referencia. Al proceder así, dicho tribunal incurrió en error de derecho. *Gacesa* v. *Consumers' Power Company,* 190 N.W. 279 (Mich.); *Smith* v. *Board of Police Com'rs of City of Los Angeles et al.,* 36 P.2d 670 (Cal.); *Great Western Power Co.* v. *Pillsbury,* 149 Pac. 35; *Muñoz* v. *Corte,* 63 D.P.R. 236; *Valiente y Cía.* v. *Corte,* 68 D.P.R. 529. Como tal, puede ser revisado en un recurso como el presente. Hemos resuelto "que este Tribunal tiene el poder discrecional de expedir autos

---

(4) El artículo 383 del Código de Enjuiciamiento Civil dispone que: "Se presume que un testigo dice la verdad. Esta presunción, sin embargo, puede ser rechazada, por la forma en que declare, por el carácter de su declaración o por evidencia que afecte su veracidad, honradez, integridad o móviles, o por evidencia contradictoria."

de certiorari para revisar errores cometidos por las cortes inferiores no importa la naturaleza del error imputado". *Pérez* v. *Tribunal de Distrito*, 69 D.P.R. 4; *Mercado Riera* v. *Mercado Riera*, 152 F.2d 86 (C.C.A. 1). No hay razón para distinguir entre los errores que son revisables por certiorari, siempre que se trate de errores de derecho. Por tanto, un error de ese carácter puede ser revisado, por razón de su naturaleza, aunque se origine o surja de la consideración de la prueba, y ésta puede y debe ser examinada por este Tribunal cuando sea necesario para resolver si se ha incurrido en error de esa categoría; no, desde luego, para pesarla, o para determinar hacia qué lado prepondera, o se inclinan las probabilidades. Con el primero de estos propósitos es que la hemos examinado en el presente recurso, llegando a la conclusión, que al exonerar al interventor de los cargos núms. 2 y 3, el tribunal sentenciador incurrió en error de derecho.

En vista de las disposiciones del artículo 383 del Código de Enjuiciamiento Civil, a la luz de la doctrina expuesta por este Tribunal en los casos citados, y por los motivos consignados en esta opinión, los testimonios de Ríos Monroy y Arroyo Ortiz fueron erróneamente descartados, debiendo considerarse como legalmente establecidos los hechos sobre los cuales dichos testigos declararon.

En un certiorari podemos dictar la sentencia final que debió dictar el tribunal a quo, *Pérez* v. *Tribunal de Distrito*, supra; *Fernández* v. *Corte*, 71 D.P.R. 161, y en este recurso estamos en condiciones de hacerlo.

En virtud de las razones expuestas, *se dejará sin efecto la resolución del tribunal sentenciador declarando sin lugar la querella y se dictará sentencia declarando probados parcialmente los cargos núms. 2 y 3 de la misma, y en su consecuencia, destituyendo al interventor, Bernardo Feliciano, del puesto de maestro de instrucción pública, con los efectos subsiguientes de cancelación de la licencia o licencias para ejercer el magisterio.*