RAFAEL CUEBAS FERNÁNDEZ ET AL., demandantes y recurrentes, *v.* THE PORTO RICAN & AMERICAN INSURANCE COMPANY, demandada y recurrida.

*Número:* 150 *Resuelto:* 12 de junio de 1962

628

*Jorge Sous,* abogado de los recurrentes; *Córdova & González* y *Héctor Martínez Muñoz,* abogados de la recurrida.

Sala integrada por el Juez Asociado señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El menor Rafael Cuebas Fernández y sus padres don Rafael Cuebas Polanco y doña Nora Fernández interpusieron acción contra The Porto Rican and American Insurance Company en reclamación de daños y perjuicios sufridos al recibir dicho menor el impacto de un balín de mostacilla calibre 22, el día 26 de junio de 1957 y como consecuencia de los actos de Francisco Rovira Fernández, también menor de edad. La demanda se fundó en la responsabilidad que había asumido la compañía demandada en virtud de una póliza que había expedido a favor de Francisco Rovira Graña. De acuerdo con las condiciones de dicha póliza el término "asegurado" incluía además del asegurado, a los familiares de éste que vivieran con él en su hogar, entre los cuales figuraba su hijo Francisco Rovira Fernández. Dicho contrato de seguro imponía al asegurado, entre otras, las siguientes obligaciones: (a) notificar inmediatamente por escrito a la aseguradora o a alguno de sus agentes la ocurrencia del accidente, debiendo contener tal notificación toda la información

que pudiese razonablemente obtener el asegurado en relación con el sitio, la hora y circunstancias bajo las cuales ocurrió el accidente y el nombre y dirección de la persona lesionada y de los testigos que hubiesen observado el suceso; (b) cooperar con la compañía; (c) comparecer a las vistas y juicios que fueren necesarios para prestar testimonio en relación con el caso; (d) prestar ayuda a la compañía para efectuar cualquier transacción en relación con la reclamación.

Luego de un juicio en los méritos el Tribunal Superior dictó sentencia exonerando de responsabilidad a la compañía demandada por el fundamento de que el asegurado había violado la condición de la póliza que le impone la obligación de cooperar con la aseguradora. Esa es precisamente la cuestión medular envuelta en el presente recurso.

Hemos dicho que el accidente ocurrió el día 26 de junio de 1957. Tres días después el asegurado señor Francisco Rovira Graña notificó por escrito a la compañía aseguradora, a través de su agente en Mayagüez, la ocurrencia del accidente, describiéndolo así: "el niñito Rafael Cuebas, jugaba en el patio con un balín que encontró (mostacilla) y el joven Francisco Rovira Fernández se lo quitó y se puso a darle con un instrumento por el fulminante y cuando explotó el balín hirió al niñito". En ese informe de accidente, que es un impreso suministrado por la compañía, se le informaba, el sitio y hora del accidente, la naturaleza de la herida recibida por el niño perjudicado, nombre de la Clínica donde fue hospitalizado y del doctor que lo atendió. Además se le informaba que todavía no se había hecho ninguna reclamación en relación con ese accidente pero que la harían. También se indicaba mediante una nota al pie del impreso que no se informó a la policía.

La versión sobre como ocurrió el accidente le fue suministrada al señor Rovira ya que él no lo presenció.

El día 1ro. de septiembre del mismo año 1957, el señor Rafael Cuebas Polanco, padre del niño lesionado, escribió al

ajustador de la compañía demandada, Sr. José Luis Colón, informándole del accidente e interesando saber el resultado de la investigación practicada por la compañía y su actitud en cuanto al caso antes de proceder a establecer su reclamación por la vía judicial. Esa carta no fue contestada por la aseguradora. En 25 de octubre de 1957 el abogado Sr. Blanco Lugo escribió a la compañía demandada informándole que había asumido la representación de los demandantes para la reclamación originada en un accidente ocurrido el día 26 de junio de 1957 y cubierto por la póliza de responsabilidad pública expedida por esa compañía a favor del Sr. Rovira Graña. En esa comunicación escrita el referido abogado requería a la aseguradora para que aceptase su responsabilidad y le informaba que estaba en la mejor disposición para reunirse con la compañía con el propósito de discutir y arreglar satisfactoriamente el asunto. Esa carta tampoco fue contestada. En el mismo mes de octubre de 1957, según la prueba incontrovertida que hay en el récord, el abogado de los demandantes urgió personalmente del Sr. Colón, ajustador y jefe de la División de Reclamaciones de la compañía, que le contestara sobre el asunto, replicando éste que la compañía no tenía responsabilidad porque ellos podían probar que el padre del menor Rovira, había actuado como un buen padre de familia. En dos o tres ocasiones posteriores dicho abogado se encontró con el ajustador Colón y le indicó la versión del accidente que le había dado el niño demandante y que era al efecto de que dicho niño había sido víctima de un disparo que había salido de una escopeta manipulada por el joven Rovira.(¹)

---

(¹) Es el propio abogado de la aseguradora, el Lcdo. Martínez Muñoz, quien confirma la veracidad de lo declarado por el abogado de los demandantes respecto a las gestiones que realizó con el ajustador, Sr. Colón, en relación con el caso. Cuando se discutía la admisibilidad de la copia de la carta de 25 de octubre de 1957 dirigida por el abogado de los demandantes a la compañía, ocurrió lo siguiente:

"Lcdo. Blanco Lugo: ¿El compañero admite que nunca se contestó?

·En octubre 11 de 1957 la compañía se dirige por escrito al ·Cuartel de la Policía de Mayagüez solicitando copia del asiento del libro ·de novedades sobre el accidente ocurrido en 26 de junio. No existía entonces tal asiento pues el accidente no había sido informado a la policía. Con motivo de esa solicitud de la compañía, la policía inició una investigación, que se practicó en el mes de diciembre del mismo año 1957. En esa investigación se examinó, solamente al menor Francisco Rovira Fernández, quien dio la misma versión que ya su padre había dado a la compañía, y a la madre del niño lesionado quien manifestó que en el susodicho accidente no medió intención criminal por parte de Rovira Fernández.

En julio de 1958, cuando ya había transcurrido más de un año desde la fecha del accidente, se radicó la demanda. Tres meses después, o sea, en octubre del mismo año, la demandada radicó su contestación negando casi todos los hechos de la demanda y aduciendo como defensa especial que dicha demanda no aducía hechos constitutivos de una causa de acción porque no contenía alegación alguna de negligencia. A la contestación se acompañó un interrogatorio que fue contestado en el mismo mes de octubre por los demandantes. La contestación a la, pregunta número cuatro de ese interrogatorio es como sigue:

"4. El menor demandante sufrió el impacto de un balín en la región del hígado. Dicho impacto fue producido por una escopeta calibre 22, propiedad del Sr. Noé Fernández Pabón de Cabo Rojo, Puerto Rico. Al ocurrir el accidente la escopeta estaba siendo manipulada por Francisco Rovira Fernández."

Fue entonces que los agentes de la compañía se entrevistaron con el Sr. Francisco Rovira Graña y por vez pri-

---

"Lcdo.. Martínez Muñoz: No puedo admitir eso;. pero a mí me consta que el compañero Blanco Lugo se nos acercó a mí y al señor Colón para discutir esto. Sí, admitimos que se recibió."

Además, el ajustador Sr. Colón, no ocupó la silla de los testigos para negar o contradecir en alguna forma el testimonió del abogado de los demandantes.

mera con su hijo Francisco Rovira Fernández. Ambos firmaron, con fecha 12 de diciembre de 1958, una declaración para la compañía haciendo constar lo siguiente en cuanto a la forma en que había ocurrido el accidente:

"En el día de los hechos me encontraba yo en el patio de mi casa tirando con una escopeta Cal. 22. Cuando el niño Rafaelito Cuebas trató de quitarme la escopeta agarrándola por el cañón en ese instante fue cuando se safó el tiro hiriendo al niño."

Una vez obtenida esta declaración la compañía demandada radicó, en 29 de diciembre de 1958 una contestación enmendada levantando por vez primera la defensa de falta de cooperación del asegurado y alegando haber sufrido por ello grave perjuicio por las siguientes razones:

"(a) Que al remitir un Aviso de Accidente a la demandada dio una versión del accidente distinta e irreconciliable con la suministrada hace varios días al abogado suscribiente, y por mediar estrechas relaciones de parentesco entre las partes le constaba que una versión no refleja la realidad de lo ocurrido. (b) Que la veracidad de una y otra versión ha quedado destruida y la demandada perjudicada en la defensa de sus intereses por el efecto adverso que necesariamente habrá de producir en el Hon. Tribunal la presentación de dos versiones, provenientes de una misma fuente, que son irreconciliables entre sí."

El juicio se celebró el día seis de marzo de 1959, esto es, cuando habían transcurrido más de dos meses desde que la compañía radicó su contestación enmendada levantando la defensa de falta de cooperación del asegurado. En la vista del caso se ofrecieron dos versiones del accidente. Una, por el menor Rovira Fernández quien dio la misma versión que había dado por escrito a la compañía en diciembre de 1958. También se presentó prueba de que este menor había dado al fiscal la otra versión de que el accidente había ocurrido al él explotar el balín con una piedra. La otra versión la dio el niño perjudicado, según la cual el joven Rovira Fernández se encontraba en el patio de su casa disparándole con

un rifle calibre 22 a unas palomas. De pronto giró rápidamente hacia atrás saliendo el disparo que hirió en el vientre a su primo hermano Rafael Cuebas Fernández.([2])

En relación con la forma como ocurrió el accidente, el juez sentenciador formuló las siguientes conclusiones de hecho:

"1.—El día 26 de junio de 1957 el menor demandante Rafael Cuebas Polanco recibió una herida de balín de mostacilla de un rifle que se le disparó accidentalmente a su primo Francisco Rovira Fernández, quien entonces contaba alrededor de 17 años de edad, mientras ambos menores se encontraban en el patio de la residencia de los padres del menor Francisco Rovira Fernández, el Sr| Francisco Rovira Graña y su esposa Elida Fernández Pabón.

"⋅ .  .  .  .  .  ⁃  .

"14. El juicio del caso se celebró el día 6 de marzo de 1959. En relación con la forma en que ocurrió este accidente, decla-

_____

([2]) El niño Rafael Cuebas declaró en síntesis que era amigo de su primo, acostumbraba a jugar juntos y a veces se pasaba temporadas en la casa de él; que el día del accidente, como a las doce meridiano, su primo se encontraba en el patio de su casa disparándole con un rifle a unas palomas y lo invitó para que lo viera disparar; que estando su primo en cuclillas, giró rápidamente hacia atrás y le disparó; que inmediatamente su primo se puso de pie, lo recogió en sus brazos y lo llevó a la cocina donde estaba la madre de su primo. Copiamos del récord taquigráfico:

"P.—¿Y qué hacías tú allí?
"R.—Él me había invitado a verlo cómo él disparaba.
"P.—¿Y qué ocurrió después?
"R.—Pues yo estaba parado detrás de él y él, de momento, viró para atrás y me disparó.
    "Lcdo. Martínez Muñoz: ¿Qué?
    "Lcdo. Blanco Lugo: "Viró para atrás y me disparó."
    "Lcdo. Martínez Muñoz: ¿Miró?
    "Lcdo. Blanco Lugo: Viró.
"Lcdo. Blanco Lugo:
"P.—¿En qué posición estaba tu primo antes de disparar?
"R.—Ñangotao.
"P.—¿Tú podrías bajarte de la silla e ilustrar al Sr. Juez, la forma en que él estaba?
"R.—Así.
      "Lcdo. Blanco Lugo: A los efectos de récord, se hace constar que el niño ha abandonado la silla testifical y ha adoptado una posición con la rodilla derecha des-

raron las únicas dos personas que presenciaron la ocurrencia del mismo: El menor perjudicado Rafael Cuebas Fernández y el joven que ocasionó el daño, Francisco Rovira Fernández. El menor demandante, quien cuenta actualmente 8 años de edad, declaró que su primo Francisco Rovira está arrodillado disparando hacia unas palomas que estaban paradas sobre el techo de una casa vecina; que él estaba parado detrás de su primo viéndolo disparar, ya que su primo lo había invitado a bajar al patio a verlo disparar, y que de momento Paquito giró hacia atrás rápidamente con la rodilla en tierra y en ese momento salió el disparo, resultando él herido en el abdomen. Y el joven Francisco Rovira Fernández, al ser llamado a declarar por la compañía aseguradora, declaró que el accidente había ocurrido al ir él y su primo Rafael Cuebas a agarrar simultáneamente ese rifle de balines que estaba en el suelo para dispararle a unas palomas, habiendo Rafael Cuebas agarrado el rifle por el cañón, habiéndosele zafado el tiro en esos momentos. La compañía aseguradora tuvo necesariamente que limitarse a impugnar la veracidad del joven Francisco Rovira y de su padre Francisco Rovira Graña, cuyos testimonios no le merecieron

---

cansando en el piso, y la otra rodilla en ángulo aproximadamente, más o menos de noventa grados. Digo, la otra pierna en ángulo más o menos de noventa grados. "(Al niño) Súbete otra vez.

"Ledo. Blanco Lugo:

"P.—¿Y qué movimiento fue el que hizo tu primo después que tenía la posición que tú acabas de indicar?

"R.—Viró para atrás así.

"P.—¿Tú tendrías la bondad de volver acá—y perdone la Corte la molestia—, e ilustra en qué forma fue que actuó tu primo? "Ledo. Blanco Lugo: Para fines de récord, hacemos constar que el niño ha adoptado la posición original y ha descrito una forma circular. "Ledo. Martínez Muñoz: En un movimiento rápido. "Ledo. Blanco Lugo. En un movimiento rápido.

"Hon. Juez:

"P.—¿Cuando salió el disparo todavía estaba de rodillas?

"R.—No. Él se paró rápido. Yo estaba parado y me llegué a caer de la silla cuando me recogió.

"Ledo. Blanco Lugo:

"P.—¿Cómo fue?

"R.—Él me disparó rápido y rápido tiró la escopeta y me recogió.

"P.—Súbete arriba. . . . . ¿Qué tú sentiste?

"R.—Pues dolores de barriga.

crédito al Tribunal, quedando ante la consideración del Tribunal como únicamente versión aceptable de los hechos la versión ofrecida por el menor demandante."

En sus conclusiones de derecho se expresó así el tribunal sentenciador:

"Y el caso de autos es uno de esos casos en que, a nuestro juicio, la completa falta de cooperación del asegurado y de su hijo ·con la compañía aseguradora, no solamente colocó a la demandada en un estado de indefensión, sino que además, la conducta del asegurado y de su hijo, unida a la actitud de los demandantes y de su abogado de guardarse de suministrar a la demandada información en cuanto a la forma en que había ocurrido el accidente hasta pocos meses antes del juicio cuando contestaron el interrogatorio de la demandada, unido todo ello a la estrecha relación de parentesco de los padres de estos dos menores y al hecho de que el accidente en ningún momento se notificó a las autoridades, justificadamente llevó al ánimo de la compañía aseguradora una actitud de sospecha que justificó plenamente la actitud de la compañía de abstenerse de tratar de obtener una transacción extrajudicial del caso, siendo obvio que ese solo hecho es suficiente daño para justificar el relevo

"P.—¿En qué sitio tú recibiste el disparo?

"R.—En el patio.

"P.—¿Pero en qué sitio de tu cuerpo?

"R.—Aquí.

"Lcdo. Blanco Lugo: Se señala el abdomen.

"Lcdo. Blanco Lugo:

"P.—¿Tú tienes alguna cicatriz con motivo de ese accidente?

"R.—Sí.

"P.—¿Tendrías la bondad de mostrarle al Sr. Juez?

"R.— (El niño está mostrando.)

"Lcdo. Blanco Lugo: ¿El Sr. Juez quiere hacer alguna observación en el récord?

"Hon. Juez: Quítate la mano . . .

"Ven acá. (Se acerca el niño.)

"El niño presenta en el vientre, al lado derecho del ombligo, como a una pulgada del lado derecho del ombligo, una cicatriz larga, que da la impresión de ser una cicatriz de una operación, ¿no?

"Lcdo. Blanco Lugo: Exactamente.

"Hon. Juez: Una cicatriz como de tres y media o cuatro pulgadas de largo y a la parte arriba de ·esta cicatriz hay un ·punto como pulgada y media hacia arriba del ombligo, y hacia la derecha hay una cicatriz más· o

«de la compañía demandada de la obligación contraída por dicha
·compañía en el contrato de seguro convenido con el asegu-
:rado.  *Buffalo v. U. S. Fidelity & G. Co.*, 84 F.2d 883; *Hoffman
v. Labutzke*, (1940) 233 Wis. 365, 289 N.W. 652.

"Las contradicciones del Sr. Francisco Rovira Graña y de
su hijo en cuanto a la forma en que había ocurrido este acci-
dente dejó a la compañía completamente huérfana de testigos
que pudieran dar luz sobre la verdad de la forma en que había
ocurrido este desgraciado accidente.  Y tampoco tenía la com-
pañía a su alcance el resultado de una efectiva investigación
policíaca, ya que el propio menor asegurado fue el único que
declaró a la policía, en cuanto a la forma en que había ocurrido
este accidente, y en esa ocasión también·dio el joven Francisco
Rovira la misma versión falsa de los hechos que se le había
dado originalmente a la compañía en el aviso del accidente,
habiendo el joven Rovira repetido esa versión ante las auto-
ridades con el asentimiento implícito de sus padres y de los
padres del menor lesionado.

"Para tratar de averiguar la verdad de la forma en que
realmente había ocurrido este accidente, sólo le restaba a la
compañía aseguradora acudir a la parte demandante.  Y aunque
la versión ofrecida por el menor demandante en el juicio nos
pareció la más creíble, considerando todas las circunstancias

---

menos redonda, como de media pulgada o tres cuartos
de pulgada de ·diámetro.

"Lcdo. Blanco Lugo: Muchas gracias, Sr. Juez.

"Siéntate allá, Rafaelito.

"Lcdo. Blanco Lugo:

"P.—¿Entonces tú dices que después que tu primo te hizo eso ocurrió
qué?

"R.—Él me recogió y me llevó a la cocina donde estaba mi tía y me
entregó a ella.

"P.—¿Y qué tú sentías en ese momento?

"R.—Pues dolores de barriga.

"P.—¿Estabas consciente?

"R.—Sí.

"P.—¿Dónde te llevaron después?

"R.—Clínica Perea.

"P.—¿Cuando tú llegaste a la clínica subiste por tus piernas?

"R.—No, ya estaba casi medio mariado.

"P.—¿Cómo estaba tu visión?

"R.—Como dando vueltas.

"P.—¿Después que llegaste a la clínica qué ocurrió?

"R.—Yo no sé nada más de ahí."  (Págs. 12 a 16 del récord
taquigráfico.)

de este caso, no podemos culpar a la compañía por abstenerse de buscar esa versión como la verdad de la forma en que ocurrió este accidente, máxime cuando la madre del menor demandante implícitamente consintió a la primera versión de los hechos que dio en su presencia su sobrino primeramente a la policía y luego al Fiscal cuando se investigó el caso a solicitud de la compañía aseguradora." ■

En *Faulkner* v. *Nieves*, 76 D.P.R. 434, ratificamos el principio de que las condiciones en la póliza de seguros de cooperación con el asegurador son enteramente válidas y que su incumplimiento por el asegurado generalmente impide que pueda obtenerse indemnización del asegurador. Empero ese principio general tiene múltiples excepciones. Como una de esas excepciones, ya habíamos señalado en *Colón* v. *Gobierno de la Capital*, 62 D.P.R. 25, 38, que el reclamante de daños y perjuicios puede protegerse contra esa defensa notificando a la compañía aseguradora de la ocurrencia del accidente, haciéndola parte demandada al iniciar su acción y emplazándola y entregándole copia de la demanda. También resolvimos en dicho caso de *Faulkner*, que para que el incumplimiento de la obligación de notificar por escrito el accidente releve a la aseguradora de responsabilidad es necesario que ésta demuestre que tal incumplimiento le causó daños sustanciales. "La palabra 'cooperación' en una póliza como la aquí envuelta, significa el suministrar a la aseguradora la información necesaria que permita a ésta determinar si existe de su parte una defensa legítima en relación con la reclamación que se le hace. *Ocean Accident & Guarantee Corporation* v. *Lucas*, 74 F.2d 115, 117; *Coleman* v. *New Amsterdam Casualty Co.*, 160 N.E. 367, 369; 139 *A.L.R.* 784; *General Casualty & Surety Co.* v. *Kierstead*, 67 F.2d 523, 525. Esa información, repetimos, no la dio en este caso el asegurado, mas sí la dio, y estuvo dispuesto en todo momento a darla, el propio perjudicado. Ello a nuestro juicio basta, no precisamente porque la suministrada a la aseguradora la ponía en condiciones de determinar si le asis-

tía o no una buena defensa, sino porque la colocó en posición de practicar con prontitud cualquier investigación necesaria y de concluir si su asegurado había sido o no culpable del accidente." *Faulkner* v. *Nieves*, 76 D.P.R. 434, 440, 441. Véanse, además, *Landol* v. *Colón*, 78 D.P.R. 602 y *Lafontaine* v. *Municipio*, 79 D.P.R. 583. ■

Para que la falta de cooperación del asegurado constituya un eximente de la responsabilidad del asegurador, lo debe ser en algún aspecto material y sustancial que le cause perjuicio.(3) ■

La cláusula de cooperación que impone al asegurado la obligación de suministrar al asegurador toda la información que pueda obtener razonablemente en relación con circunstancias bajo las cuales ocurrió el accidente, tiene como propósito el proveer una oportunidad al asegurador de prepararse para enfrentar cualquier reclamación o para determinar si tiene una defensa genuina. En ocasiones, el asegurado trasmite al asegurador una primera información incorrecta e incierta en cuanto a las circunstancias del accidente; pero ese hecho de por sí solo no siempre constituye necesariamente una violación de la cláusula de cooperación, especialmente en ausencia de fraude, colusión o propósito de perjudicar al asegurador. Igual principio es generalmente aplicable cuando el asegurado modifica o repudia su versión original del accidente. Para determinar si la variación entre la primera versión del accidente suministrada por el asegurado al asegurador y versiones subsiguientes de aquél constituyen una violación a la cláusula de cooperación debe considerarse la naturaleza de la variación y el efecto de la misma respecto a la situación en que se coloca al asegurador para enfrentarse a una reclamación. Es indudable, desde luego, que en muchos casos una narración sustancial, intencional o fraudulenta, puede colocar al asegurador en un

---

(3)*Broussard* v. *Broussard*, 84 So.2d 899; *Curran* v. *Connecticut Ind. Co.*, 20 A.2d 87.

estado de indefensión o puede privarle de la oportunidad de transigir la reclamación.(4)    En tal caso la cláusula de cooperación relevaría de responsabilidad al asegurador. ■

'    En el presente caso no podemos convenir con la Sala sentenciadora en que el asegurado violó la cláusula de cooperación en forma tal que eximiese a la aseguradora de responsabilidad.    De acuerdo con la primera versión del accidente suministrada a la aseguradora a los tres días de haber ocurrido el mismo, la compañía aseguradora respondía de los daños sufridos por los demandantes.    Igualmente respondía de dichos daños bajo la versión dada por el menor Francisco Rovira Fernández a la compañía después de radicada la demanda y que fue ratificada por el referido menor en corte durante el juicio.    Aun la tercera versión producida en corte por el menor demandante, aunque variaba los detalles del accidente, en lo fundamental establecía el hecho de que el disparo que hirió a dicho menor salió de un rifle manipulado negligentemente por el joven Rovira Fernández.    Y la Sala sentenciadora concluyó, a nuestro juicio, correctamente, que bajo la versión del demandante, que considera la más creíble de todas, la aseguradora respondería, al igual que bajo las otras dos versiones.    Sabemos, por lo que ya hemos relatado, que la demandada tuvo conocimiento de la versión de los demandantes en el mes de octubre de 1957, o sea, unos 10 meses antes de radicarse la demanda.    A pesar de que por conducto de su abogado ellos invitaron a la demandada antes de radicarse la demanda para discutir el asunto y llegar a una transacción de ser posible, la demandada se negó a ello.    Pero más aun, después que la deman-

---

(4) Véase Anotaciones en 34 A.L.R.2d 264; 79 A.L.R.2d 1040; 139 A.L.R. 771; 98 A.L.R. 1465; 72 A.L.R. 1446; 8 Appleman, *Insurance Law and Practice*, § 4783, pág. 143; 2 Richards *on Insurance*, § 361, pág. 1188; 29 Am. Jur., § 789 y siguientes; *Broussard v. Broussard*, 84 So. 899; *Norwich Union Indemnity Co.* v. *Hass*, 179 F.2d 827; *Nutronwide Mutual Insurance Co.* v. *Burga*, 134 A.2d 89; *State Automobile Ins. Co.* v. *York*, 104 F.2d 730; *Bernadich* v. *Bernadich*, 283 N.W. 5; *Farmers Automobile Inter Insurance Exch.* v. *Konugres*, 202 P.2d 959.

dada se enteró de la versión del accidente que daría en corte el asegurado, transcurrieron más de dos meses antes de que se celebrara el juicio, y la aseguradora, teniendo conocimiento de las distintas versiones que la hacían siempre responsable, nunca intentó transigir la reclamación.

Aparentemente descansó en que como el asegurado había dado dos versiones distintas del accidente, las cuales diferían de la de los demandantes, ese hecho le exoneraba de responsabilidad bajo las condiciones de la póliza. Confió pues en una defensa técnica a base de unos hechos que no le impidieron prepararse para enfrentarse a la reclamación y mucho menos para lograr una transacción.

En sus conclusiones de derecho sostuvo el tribunal sentenciador que la falta de cooperación del asegurado colocó a la aseguradora en un estado de indefensión y que dada la conducta del asegurado y de su hijo, así como la de su abogado, unidos a la estrecha relación de parentesco de los padres de los menores envueltos en el accidente, crearon en el ánimo de la aseguradora justificadamente una actitud de sospecha que a su vez la justificaban plenamente en abstenerse de tratar de obtener una transacción extrajudicial del caso, siendo obvio que ese solo hecho es suficiente daño para relevarlo de la obligación contraída en el contrato de seguro. Cita los casos de *Buffalo* v. *U. S. Fidelity & Co.*, 84 F.2d 883 y el de *Hoffman* v. *Labuztzke*, 233 Wis. 365, 289 N.W. 652. En el primero de dichos casos el automóvil de Buffalo estaba cubierto por una póliza de responsabilidad pública. La cubierta se limitaba a accidentes ocurridos mientras el automóvil fuera conducido por Buffalo o bajo la supervisión personal de un tal Jolley mientras actuara en su capacidad de chófer de Buffalo. El automóvil tuvo una seria colisión con el de Wyer. Este demandó a Buffalo y la compañía aseguradora lo defendió sin renunciar a sus derechos bajo la póliza. Buffalo había informado por escrito a la compañía que ni él ni Jolley se encontraban en el automóvil

cuando ocurrió el accidente, lo que claramente excluía dicho accidente de la cubierta de la póliza. Se presentó prueba en el juicio de que Buffalo y Jolley estaban en el automóvil cuando ocurrió el accidente. El jurado rindió un veredicto condenando a Buffalo a pagar daños y perjuicios a Wyer. Cuando este último demandó a la compañía aseguradora para cobrar la sentencia, la acción fue declarada sin lugar porque Buffalo había violado la cláusula de cooperación al declarar voluntaria y falsamente que ni él ni Jolley se encontraban en el automóvil cuando ocurrió el accidente. Obviamente, en ese caso el asegurado privó a la aseguradora de transigir la reclamación. Por eso la falsa información dada por Buffalo perjudicó los intereses de la aseguradora.

En el caso de *Hoffman* la falsa información dada por el asegurado inculpando del accidente a una persona inexistente, privó también a la aseguradora de transigir la reclamación en vez de defenderse del caso en los méritos, por lo que se resolvió que el asegurado había violado la cláusula de cooperación en perjuicio de la aseguradora. En ambos casos la actuación de los asegurados causó perjuicio sustancial a las aseguradoras considerándose, por consiguiente, que la violación de la cláusula de cooperación tuvo el efecto de relevar de responsabilidad a dichas aseguradoras.

En este caso, sin embargo, nada indicaba a la aseguradora que podía enfrentarse con éxito a la reclamación que a los tres días del accidente se le había informado que sería entablada en su contra. Ella tenía conocimiento desde antes de radicarse la demanda que el accidente había ocurrido por la negligencia del asegurado, bien bajo la versión original de éste o bajo la versión del demandante. Aun antes del juicio tuvo conocimiento con bastante anticipación para transigir la reclamación si lo hubiera deseado, de la versión que el asegurado daría el día del juicio. Ninguna de estas tres versiones pudo inducirla a creer que tenía una buena defensa contra la reclamación. Siendo esto así, cae por su

base la alegada defensa de que la demandada sería perjudicada por el efecto adverso que produciría en el tribunal la presentación de dos versiones contradictorias del accidente provenientes de una misma fuente.

Por otro lado, el récord no demuestra que el asegurado diera informes contradictorios a la aseguradora de mala fe, con el propósito de defraudarla o de crearle un estado de indefensión. El joven Rovira Fernández, aceptó desde el principio ser el causante del accidente y no es difícil de comprender que la omisión de mencionar el rifle obedecía más bien al temor de enfrentarse a una acción criminal y no al de defraudar a la aseguradora ya que de acuerdo con su versión original (golpear el balín con una piedra) el accidente quedaba cubierto por la póliza, lo mismo que si el balín hubiera sido disparado por un rifle manipulado negligentemente por Rovira Fernández.

Tampoco hay prueba sobre colusión entre los padres de ambos menores. Mas bien lo que el récord demuestra es que las relaciones estrechas que existían entre ellos se enfriaron desde el accidente al extremo que dejaron de visitarse.

En una de sus conclusiones de derecho el tribunal a quo se expresa así:

"Es cierto que bajo cualesquiera de las tres versiones del accidente ofrecidas por los dos menores envueltos en el mismo la compañía resultaría responsable de los daños sufridos por los demandantes, pero no hay ninguna garantía ni para la compañía demandada ni para este Tribunal de que el accidente envuelto en este caso en realidad ocurriese de una de esas tres maneras, y no de otra forma distinta de la cual pudiese resultar que el daño ocasionado no estuviese cubierto por los términos de la póliza.

"El único hecho que puede considerarse como definitivamente probado en este caso en cuanto a la forma en que ocurrió este accidente es el hecho de que el disparo que hirió al menor demandante salió de una escopeta de balines que estaba siendo manipulada en este momento por el joven Francisco Rovira Fernández, y que el disparo se hizo a corta distancia, pero ello no excluyó de por sí la posibilidad de que el accidente hubiese

ocurrido en alguna forma en que la compañía aseguradora estaría relevada de responsabilidad en virtud de los términos de la póliza, como en el caso de que el menor lesionado hubiese incurrido en negligencia contribuyente. Y en ese caso, aun cuando la compañía no quedase relevada de su responsabilidad, esa negligencia contributoria de la víctima rebajaría sustancialmente el montante de la indemnización que hubiese venido obligada a pagar la compañía, siendo ello otro argumento válido para que se deba sostener que las versiones falsas de los hechos ofrecidos a la compañía por los asegurados, unidos a la actitud de reserva y de asentimiento implícito asumida por la parte demandante, constituyen otro daño sustancial razonablemente previsible para la compañía aseguradora."

En realidad, como prueba directa de los hechos se presentaron únicamente dos versiones de la forma como ocurrió el accidente, una relatada por el joven Rovira Fernández y la otra expuesta por el niño demandante. La primera versión (la de la piedra y el balín) sólo pudo presentarse para impugnar el testimonio de Rovira Fernández o para establecer el hecho de que el asegurado había dado dos versiones distintas a la aseguradora. Sin base para ello, el tribunal a quo no da crédito a ninguna de las versiones aunque bajo cualesquiera de ellas la aseguradora respondía de los daños, y conjetura en cuanto a la posibilidad de que el accidente hubiera ocurrido en otra forma distinta de la cual pudiese resultar que el daño ocasionado no estuviese cubierto por los términos de la póliza. De hecho, esta conclusión se hace descansar en una presunción de colusión o fraude pero no está sostenida por el conjunto de la prueba, ni ésta da lugar a tal inferencia. El accidente fue presenciado únicamente por los dos niños envueltos en el mismo. Ocurrió en el patio de una residencia donde en aquellos momentos no se encontraba ninguna otra persona que pudiera testificar sobre el suceso. De suerte que la prueba sobre cómo ocurrió dicho accidente solamente la podían aportar los protagonistas en el suceso. El niño demandante nunca hizo manifestaciones contrarias a su testimonio en juicio, nunca fue

investigado por la aseguradora, ni por la policía o el fiscal. Su testimonio, en cuanto a la descripción que hizo del accidente, podía considerarse impugnado por el del joven Rovira Fernández, quien describió el accidente en una forma distinta. Sin embargo, el testimonio de Rovira Fernández no hubiera sido suficiente para desacreditar el testimonio del niño demandante pues aun antes de que éste declarara, ya el juez había manifestado que no daba crédito a Rovira Fernández. En verdad no encontramos un fundamento razonable para que se negara credibilidad al menor demandante.[5] La circunstancia de que exista esa discrepancia entre los testimonios del menor demandante y el de Rovira Fernández más bien favorece la inferencia de ausencia de colusión. ■

Es erróneo afirmar que en el supuesto de que en el accidente hubiera mediado negligencia contribuyente del menor demandante, ello relevaba de responsabilidad a la compañía aseguradora y que aun cuando la compañía no quedase relevada de su responsabilidad, la negligencia contributoria de la víctima rebajaría sustancialmente el montante de la indemnización que hubiese venido obligada a pagar la compañía. Pero es que en el supuesto de que el accidente hubiera ocurrido en esa forma imaginaria, la negligencia contribuyente no hubiera sido defensa para la aseguradora, ni aun para mitigar la cuantía de los daños, ya que se trataba de un niño que sólo contaba seis años de edad. Véase *Irizarry* v. *Pueblo*, 75 D.P.R. 786 y casos citados a la página 792. ■

Concluímos que los hechos y circunstancias de este caso no revelan una violación de la cláusula de cooperación que resultara en perjuicio sustancial para la aseguradora y por ende, relevada de responsabilidad.

Como estamos en condiciones de dictar la sentencia que debió dictar el tribunal de instancia consideremos ahora la naturaleza de los daños sufridos por los demandantes a fin de fijar su cuantía.

---

[5] Véase *Villaronga, Com.* v. *Tribunal de Distrito*, 74 D.P.R. 331.

Refiriéndose a la falta de oportunidad que tuvo la compañía demandada para minimizar el montante de su responsabilidad, el tribunal de instancia agregó: "que en este caso, considerando la alta cubierta de la póliza y la seriedad de los daños sufridos por el niñito lesionado y por sus padres, no cabe duda que hubiese subido a una suma considerable". Así es en efecto.

El niño demandante llegó a la clínica en estado de "shock" y se quejaba de dolor en el vientre. Presentaba una herida de mostacilla en la región hepática, lado derecho. La herida era del tamaño de una moneda de medio dólar o un poco más pequeña y estaba sangrando. Fue sometido el paciente a una intervención quirúrgica abriéndole el abdomen. Encontraron una herida en el hígado que estaba sangrando. Se suturó el hígado, se removieron algunas mostacillas sueltas en el abdomen y luego se cerró el vientre con drenaje. El doctor Nelson Perea declaró que el caso era grave y así se lo indicó a los familiares del niño, entendiendo por grave que podía morirse en cualquier momento y que esa gravedad se prolongó por tres días durante los cuales se le hicieron transfusiones de sangre. Estuvo el niño recluído en la clínica aproximadamente de diez a doce días y luego recibió tratamiento ambulatorio como por cinco o seis semanas. A los veintiún meses del accidente el niño tenía todavía cuarenta o cincuenta mostacillas incrustadas en el hígado y en el peritóneo. Esas mostacillas no se le pueden extraer y aunque lo natural es que no le produzca nada, cualesquiera de ellas puede causar inflamación en cualquier momento y habría que extraerla. Declaró además el Doctor Perea que no puede determinar si la presencia de cuerpos extraños en el organismo del niño pueda traerle consecuencias graves y que la única forma de asegurarse de lo contrario sería extrayéndole todas, cosa que no recomienda debido al gran número de ellas.

646

Considerando todas estas circunstancias así como los sufrimientos físicos y mentales del menor demandante estimamos como justa compensación para él la cantidad de $15,000.

Para formar una idea en cuanto a las intensas y prolongadas angustias y sufrimientos mentales de los padres del niño, bastará recordar que ellos sabían que su hijo estuvo debatiéndose entre la vida y la muerte durante tres días y que aún después continuó hospitalizado por siete u ocho días más, amén de la gran interrogación que es en cuanto al futuro, las posibles consecuencias de las mostacillas incrustadas en el cuerpo del niño.

Por ese concepto debe concedérsele a ellos una indemnización de $8,000. Además debe condenarse a la demandada a pagarles la suma de $720 en concepto de honorarios médicos y gastos de hospitalización, más las costas y $1,000 para honorarios de abogado.

*Se revocará la sentencia dictada por la Sala de Mayagüez del Tribunal Superior y se dictará otra de conformidad con los términos de esta opinión.*

