Hernández Torres, Jueza Ponente
*1180 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos la parte apelante, Nixaliz Hernández Silva, en adelante, la apelante, solicitando la revisión de una Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Caguas. Mediante dicho dictamen, el tribunal a quo, entre otros extremos, determinó que el despido de la apelante fue con justa causa y declaró Con Lugar el derecho a pago por vacaciones y licencia por enfermedad.
Por las razones que esbozamos a continuación, se confirma la Sentencia apelada.
I
Conforme surge del recurso ante nuestra consideración, el 22 de julio de 2005, la apelante interpuso Querella sobre discrimen por embarazo, horas extras, período de alimento, vacaciones y días por enfermedad contra Brenda Soltero, José Santiago, ambos en su carácter personal, Creative Concept, Inc. y Kar Val Corp. Dichas causas de acción se instaron al amparo de las siguientes leyes: Ley Núm. 17 de 22 de abril de 1988, 29 L.P.R.A. sec. 155 et seq.; Ley Núm. 3 de 13 de marzo de 1949, según enmendada, 29 L.P.R.A. sec. 467, et seq., (Ley de Madres Obreras), Ley Núm. 379 de 15 de mayo de 1948, según enmendada, 29 L.P.R.A. sec. 271 et seq., y la Ley Núm. 180 de 27 de julio de 1998, según enmendada, conocida como “Ley de Salario Mínimo, Vacaciones y Licencia por Enfermedad”, 29 L.P.R.A. see. 250 et seq.
La apelante era empleada de Creative Concept, Inc., comenzando a trabajar con la compañía como manicurista. Al momento de comenzar a trabajar, contaba con tres (3) meses de embarazo, siendo reclutada por una recepcionista y gerente, la cual actualmente no labora para la empresa. La apelada, Brenda Soltero, dueña del negocio, la entrevistó por “escasos 5 ó 10 minutos”. La apelante alegó, en lo pertinente:

6. Al comenzar a trabajar, Nixalís (apelante) no firmó ningún tipo de contrato probatorio, ni de otro tipo; sencillamente comenzó a trabajar.

*1181 7. Aproximadamente a una (1) semana y media (¥2) después de haber comenzado a trabajar, advino al conocimiento de Brenda (apelada) que Nixalís (apelante) estaba embarazada.

8. En ese momento, Brenda (apelada) se dirigió a Nixalís (apelante) y le expresó, “me enteré que estás embarazada, qué vas a hacer, porque aquí no se paga maternidad? Acto seguido le preguntó que ¿Cuántas semanas iba a tomar por maternidad?, obviamente, según su entender, de su propio pecunio.

9. Nixalís (apelante) no supo que contestar, le expresó que en su momento le informaría. Brenda (apelada), le indicó que ella era muy selectiva al momento de reclutar, pero que le quedara claro que ellos no pagaban maternidad.

10. Nixalís (apelante) continuó trabajando semanalmente hasta el sábado 9 de julio de 2005.

11. Los cuatro (4) meses que laboró, nunca pudo tomar completo su período de alimento, ya que atendía clientes mientras almorzaba.

12. El 9 de julio de 2005 como a las 9:45 de la noche Brenda (apelada) llamó por teléfono a Nixalís (apelante) a su casa y le expresó que, “no se sentía cómoda con ella y que efectivo ese mismo día no volvería a trabajar más para el salón de belleza ”.

13. Brenda (apelada) despidió a Nixalís (apelante) de su empleo, sin causa justificada alguna y contando está (sic) con 8 meses de embarazo.

14. Nixalís (apelante) comenzó a hiperventilar y llorar en el teléfono suplicando que no la despidiera en ese momento ya que estaba próxima a dar a luz y no había podido ahorrar dinero.

15. Brenda (apelada) se limitó a expresarle, “cálmate date un baño, hablamos el lunes, yo te llamo”.

16....”

Véase, Anejo 1 del Apéndice.
En su consecuencia, solicitó los remedios otorgados por las leyes laborables arriba mencionadas. La parte apelada instó alegación responsiva. Posteriormente, la apelante presentó Demanda Enmendada a fin de incluir como parte indispensable a J.B. Enterprises, Inc., corporación matriz de Creative Concepts, Inc.
Trabada la controversia entre las partes, y luego de los trámites procesales de rigor, la vista en su fondo se celebró. Aquilatada la prueba testifical y documental, el Tribunal de Primera Instancia emitió la Sentencia apelada el 9 de agosto de 2007, notificada el 12 de septiembre de 2007.
En consecuencia, el Tribunal de Primera Instancia determinó que la apelante había sido empleada de J.B. Enterprises, Inc. y que su despido había sido por justa causa. Dictaminó el foro a quo que no se había probado derecho a compensación por concepto de horas extras ni por el período de tomar alimentos. El foro de instancia declaró Con Lugar el derecho al pago por vacaciones y licencia por enfermedad.
Inconforme con el dictamen emitido, la apelante acude antes nos. Contando con el beneficio de la Transcripción de la Prueba y el alegato del apelado, procedemos a resolver.
II
En su escrito, la apelante plantea que incidió el Tribunal de Primera Instanciá en la apreciación de la prueba y *1182 desestimar la reclamación bajo las disposiciones de la Ley de Madres Obreras, despido injustificado y horas extras trabajadas; y al desestimar la Querella contra Brenda Soltero, José Santiago, Kar Val Corp. y Creative Concept, Inc. toda vez que ellos se beneficiaron de los servicios de la apelante y/o participaron del acto discriminatorio contra ésta al despedirla estando embarazada y sin justa causa.
III
La Sec. 1 del Art. II de la Carta de Derechos de la Constitución de Puerto Rico dispone expresamente que no podrá establecerse discrimen alguno, entre otras circunstancias, por razón de sexo. En el ámbito obrero-patronal, el discrimen por razón de sexo está prohibido por varias leyes. Véase, Santiago v. Oriental Bank & Trust, 157 D.P.R. 250 (2002).
La Ley Núm. 3, supra, prohíbe específicamente el discrimen por razón de embarazo, como una modalidad del discrimen por razón de género. Id., Rivera Águila v. K-Mart de P.R., 123 D.P.R. 599, 608 (1989). El estatuto está encaminado a salvaguardar los derechos de las trabajadoras embarazadas de dos (2) maneras distintas, a saber: (1) estableciendo períodos de descanso tanto antes como después del alumbramiento; y (2) prohibiendo el despido sin justa causa, y la suspensión, reducción de salario o discrimen de cualquier otra índole contra la obrera debido a la merma en la producción por causa de su estado de gestación. Santiago v. Oriental Bank & Trust, supra; García Pagán v. Shiley Caribbean, etc., 122 D.P.R. 193, 199 (1988). Así pues, “son dos [tipos de] derechos separados los que consagra la ley mencionada, que operan en distintas situaciones y con distinto resultado”. Santiago v. Oriental Bank & Trust, supra; Schneider v. Tropical Gas Company, Inc., 95 D.P.R. 626, 632 (1967).
La See. 4 del estatuto establece en lo pertinente:

“El patrono no podrá, sin causa justa, despedir a la mujer embarazada. No se entenderá que es justa causa el menor rendimiento para el trabajo, en razón del embarazo.

(a) Todo patrono que despida, suspenda, reduzca el salario, o discrimine en cualquier forma contra una trabajadora por razón de la merma en su producción mientras ésta se encuentre en estado de embarazo o rehúse restituirla en su trabajo luego del alumbramiento, incurrirá en responsabilidad civil por una suma igual al doble del importe de los daños que cualquiera de los actos antes mencionados haya causado a la trabajadora, o por una suma no menor de cien dólares ($100.00) ni mayor de mil dólares ($1,000.00) a discreción del tribunal si no se pudieran determinar daños pecuniarios, o el doble de éstos si montaran a una suma menor de cien dólares ($100.00).

La empleada además tendrá derecho a que se le reponga en su trabajo, so pena de incurrir el patrono en daños adicionales idénticos o iguales a los establecidos en esta sección. ”

29 L.P.R.A. sec. 469.
El Tribunal Supremo se ha expresado en varias ocasiones sobre el significado y alcance del concepto “justa causa” bajo la Ley Núm. 3, supra. En Schneider v. Tropical Gas Company, Inc., supra, a la pág. 629, dicho Foro aclaró que esta ley tuvo el efecto de variar el contenido del concepto de justa causa en la situación particular de la mujer embarazada, al sustraer de dicho concepto el menor rendimiento en el empleo cuando el mismo es consecuencia directa del estado de embarazo. Este menor rendimiento se refiere no sólo a aquél que se produce en términos cuantitativos, sino al que surge en términos cualitativos. Así pues, bajo esta ley surgen dos (2) protecciones relacionadas al despido de una empleada embarazada: (1) la prohibición del despido sin justa causa, que se refiere al concepto de justa causa bajo las leyes laborales; y (2) la prohibición de despido por merma en la producción como consecuencia del embarazo, lo cual, en el caso de una mujer en estado de gestación, no constituye justa causa para el despido. Santiago v. Oriental Bank & Trust, supra.
*1183 Por otra parte, en Rivera Águila v. K-mart de P.R., supra, el Tribunal Supremo explicó que, a diferencia de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. sec. 147 et seq, donde la reclamación por discrimen puede no proceder si, a pesar de no existir justa causa para el despido, el patrono prueba que el despido injustificado no fue discriminatorio, bajo la citada Ley Núm. 3, el patrono responde en daños si despide sin justa causa a una mujer embarazada, aunque el patrono logre probar que el despido no fue por razón de embarazo. Así pues, cuando una empleada reclama y prueba que fue despedida de su empleo sin justa causa mientras estaba embarazada, el patrono responderá al amparo del estatuto, a menos que logre establecer que el despido estuvo justificado. Véase Santiago v. Oriental Bank & Trust; Rivera Águila v. K-mart de P.R., supra.
Ahora bien, en Soc. de Gananciales v. Centro Gráfico, 144 D.P.R. 952 (1998), se aclaró la carga probatoria de un patrono al defenderse de una reclamación bajo la Ley Núm. 3, supra. Lo.determinante en estos casos no es si el despido fue motivado por la condición de embarazo de la demandante, sino si estando embarazada la demandante, el patrono la despidió por causa injustificada. Véase, Santiago v. Oriental Bank & Trust, supra.
El requisito esencial para la aplicación de la Ley Núm. 3, supra, es que la mujer haya sido despedida durante su embarazo; ante ese hecho, le corresponde a la parte demandada el peso de probar que había justa causa, según la ley define ese concepto, para terminar la relación obrero-patronal. Soc. de Gananciales v. Centro Gráfico, supra.
El estatuto no exige para su aplicación que el patrono haya despedido a la empleada por razón de su embarazo o con conocimiento de su estado. Lo determinante es que, como cuestión de hecho, la empleada estuviese embarazada al momento de su despido y no hubiese justa causa para despedirla.
IV
Dentro del marco jurídico antes enunciado, procedamos a resolver la controversia de autos.
En el primer error señalado, la apelante nos plantea que incidió el foro de instancia en la apreciación de la prueba. Entiende que demostró, mediante preponderancia de la prueba, que realizó su labor en exceso de la jomada ordinaria. A su vez, entiende que la prueba reflejó que había sido discriminada por encontrarse en estado de embarazo.
Comencemos señalando que surge de las determinaciones de hechos efectuadas por el Tribunal de Primera Instancia lo siguiente:

“1. Nixaliz Hernández Silva (apelante) tomó cursos como técnica de uñas. Después de ello, prestó servicios en varios salones de belleza en calidad de manicurista.

2. A mediados de marzo de 2005, Nixaliz Hernández Silva (apelante) fue a Creative Concept Nail Salon en Las Catalinas Malí. Allí habló con la recepcionista y encargada, Marielee Rivera, y le ofreció sus servicios como técnica de uñas o manicurista. Esta le manifestó que tendría que hablar con Brenda Soltero (apelada), la persona que administraba el negocio. Al día siguiente fue con una mano arreglada por ella para que doña Brenda (apelada) viese el trabajo, y como a ella le gustó, la empleó.

El acuerdo era que de la producción de Nixaliz Hernández (apelante), ésta recibiría el 40% de lo que se facturase por sus servicios en el Salón cuando era hasta $800.00 a la semana. Cuando fuese de más de $800.00 hasta mil sería un 5% de esa cantidad adicional. Por sobre $1,000.00 semanales de producción sería un 50%. Por tanto, 40% era la comisión básica y un 10% adicional en casos apropiados.

3. Doña Nixaliz (apelante) tendría el turno de 12:00 a 9:00 p.m. Ella trabajaba cinco días a la semana en el salón. No obstante, podría alguna vez comenzar antes, es decir, a las nueve de la mañana en caso de necesidad.

*1184
El salón le proveía los equipos, materiales y productos. Estos se repartían semanalmente. Pero, en caso de necesitarse, estaban en un armario y se podían solicitar. También algún esmalte o equipo lo llevaba ella. Se ofrecía por doña Nixaliz (apelante) servicio de pedicura en el salón aunque en otra área distinta a la mesa de trabajo asignada a ella. Eso era parte del trabajo general como el de manicura. La facturación por el servicio lo hacía ella y el cobro le correspondía a la recepcionista. La libreta que a ella se le entregaba permitía identificar de quién era el servicio y la comisión en el caso de Nixaliz (apelante). Los clientes eran los del salón y se asignaban por orden de llegada de la técnica. Ello implica que en el primer tumo le tocaría a la que llegó a las nueve, el segundo a la persona que llegó después y así. Luego se volvía a rotar. Los clientes podían aparecer en el salón o hacer cita. La recepcionista controlaba el libro de citas y la adjudicaba a la que estuviese disponible. También podía ser que el cliente interesase a una persona en particular. Así se acomodaba por la recepcionista. En realidad, la recepcionista es la encargada del manejo del negocio en lo cotidiano. La señora Soltero (apelada) sólo va allí el día de pago que es el jueves y los sábados medio día. Toda otra comunicación es con la recepcionista vía telefónica.

4. La señora Hernández (apelante) no tenía más que la supervisión de los clientes sobre su trabajo. Pero debía hacerlo dentro del horario establecido y en el salón._sin poder rechazar dar a clientes el servicio pedido. Dentro de Creative Concept Nail Salon no podía atender clientes suyos sin facturar por el negocio. Podría hacer trabajos por su cuenta en su tiempo libre. Pero eso sería fuera del local.

El período de tomar alimentos, Nixaliz Hernández (apelante) lo disfrutaba según su criterio. Así, podía ir a comer fuera o hacerlo en el cuarto que hay habilitado dentro del local con ese propósito. Ella podía ir a comprar la comida o encargarla. De esa forma es que todas las que laboraban allí lo hacían al igual que ella. Nunca se le prohibió salir a tomar alimentos o a comer durante el período dispuesto para ello.

5. Doña Nixaliz (apelante) no recibió un Manual de Reglas de Conducta. Ciertas reglas estaban colocadas en un papel en el espejo del área de trabajo. No obstante, su contenido o el del Manual descrito como de cinco páginas se desconoce, ya que no se ofreció prueba sobre esto en el juicio. Brenda Soltero (apelada) declaró que existen conductas que el buen orden del negocio exige de quien preste servicios en salones de belleza, tales como respetar los turnos para recibir y atender clientes.

6. Cuando Nixaliz Hernández (apelante) fue a prestar servicios al salón de belleza, se apreciaba el que se encontraba en estado de gestación. Tenía unos cuatro meses de embarazo. Ello no le causó impedimento para prestar el servicio. Tampoco se ausentó por esa razón. Fue reclutada con conocimiento de su estado y ella comentaba sobre su embarazo.

7. Desde el comienzo de su desempeño en Creative Concept Nail Salon, Nixaliz Hernández (apelante) tuvo roces con sus compañeros. Así le ponía nombres a los compañeros, hablaba mal de ellos dentro del área de empleo. Usaba frases soeces frente a los clientes lo cual hacia sentir incómodos a algunos. A uno de los empleados, Geminuel Medina, le llamaba “el maricón ese”. En cuanto a Jessica Ramírez, como su esposo enfrentó proceso penal, acudió al Centro Judicial de Caguas a ver el expediente judicial y de ese modo comentar su contenido en el salón. Además, llevaba a sus hijos al salón en contra de las normas sobre ese extremo.

8. La distribución del trabajo en el salón la hacia la recepcionista. Ella es la persona que hace y hacía la asignación de los clientes que llegaban con o sin cita. Sin embargo, doña Nixaliz (apelante) acostumbraba en el área de recepción al frente y se llevaba el cliente para atenderlo. Esto causó malestar entre los compañeros, puesto que afectaba la producción e ingresos de éstos. Hubo quejas no sólo por su lenguaje y conducta, sino por su deseo de acaparar clientes. Ello lo hacía en contravención a las normas sobre el reparto de turnos y trabajo y en perjuicio de los demás técnicos.

9. Los negocios en los centros comerciales como Las Catalinas Malí han de seguir un horario. Cuando no lo 
*1185
hacen se exponen a multas por la gerencia de Las Catalinas. Nixaliz (apelante) le causó a Creative Concept Nail Salon, en sus cuatro meses de servicio allí, que se les amenazará de multas. La práctica de ella era tomar clientes que llegaban sin ser referidas aunque sabía que tenía otro citado. Como no disponía de tiempo para terminar con el cliente que tomaba en contra del criterio de la recepcionista, hacía que terminase con el citado fuera del horario de apertura. De ahí las comunicaciones a Brenda Soltero (apelada) desde Las Catalinas Mall. La primera vez se le indicó a Nixaliz Hernández (apelante) que no debía hacer eso. Sin embargo, repitió el hecho. El libro de citas del salón con los nombres y teléfonos de los clientes de Creative Concept Inc. lo custodia la recepcionista y encargada del negocio. Los técnicos no pueden tomar el libro y anotar teléfonos o nombres de clientes de negocio.

Cuando la recepcionista Yasmin Meléndez González fue a sacar la basura, Nixaliz (apelante) se dedicó a copiar los nombres y teléfonos de los clientes. Así la sorprendió la recepcionista. Al comunicarle a Brenda Soltero (apelada), ésta determinó que eran demasiadas las quejas y los problemas que creaba Nixaliz (apelante) en tan poco tiempo. Así, el 9 de julio de 2005 le comunicó telefónicamente que prescindía de sus servicios.

10. Nixaliz Hernández (apelante) expresó que en la fecha de despido tenía ocho meses de embarazo. Que el bebé nació con problemas de salud y ello le causó que dejase de trabajar por unos dos años. Tras el despido, tuvo problemas financieros por falta de recursos. Ello la llevó a acumular deudas.

11. En Creative Concept Nail Salon, aparte de Nixaliz Hernández (apelante), han prestado servicios otras mujeres en estado de gestación sin que ello les significase algún problema para ellas. En el tribunal se observó a una empleada con impedimentos físicos. También sin problemas por ello. El despido de ella lo causó su conducta y no su condición de embarazo. La señora Soltero (apelada) no habló de ese tema con la querellante siquiera.

12. Creative Concept Nail Salon es el nombre comercial bajo el cual opera el negocio J & B Enterprises Corp., una corporación inscrita y activa en el Departamento de Estado. Su incorporador es José Santiago Vázquez. Kar-Val Inc. es una corporación incorporada por Brenda Soltero (apelada). Pero, sin activos o negocios para el año 2005.

13. Nixaliz Hernández (apelante) trabajó dieciséis semanas en Creative Concept Nail Salon. De éstos, en cinco semanas tuvo la siguiente producción: 1) $723.00; 2) $840.00; 3) $963.00; 4) $1,010.00; 5) 1,044.00. Así surge de los sobres en los cuales venían los cheques firmados por Brenda Soltero (apelada). En uno de ellos, el de $1,010.00 se añadió $7.00 al pago. En general, cobró en la semana: 1) de esta determinación es el $289.20; 2) $330.00; 3) $393.35; 4) $437.60 y $429.80. Eso ofrece en promedio de $75.20 al día al cual se llega dividiendo los $1,879.95 por los cinco día de cada semana.

14. La única persona que prestaba servicios sin contrato de empleo en ese salón era Nixaliz Hernández (apelante). En la actualidad, no hay ninguna otra persona en tal condición.

15. Nixaliz Hernández Silva (apelante) era competente y productiva en su desempeño. Su conducta y métodos, sin embargo, afectaban la operación del negocio tanto por las quejas de otros técnicos como por el peligro para la entidad con el arrendador. Las quejas generalizadas del personal contra Nixaliz (apelante) por su vocabulario, comportamiento en la relación personal y por la aprobación de clientes. Fue informada al patrono y la acción la tomó al acumular muchas razones en pocas semanas.

16. No se le liquidó pago de licencia de vacaciones por enfermedad o regulares al despido a la querellante. ”

Véase, Exhibit IX del Apéndice.
La Ley Núm. 3, supra, no establece categóricamente las circunstancias en las cuales se entenderá que un *1186 despido fue llevado a cabo mediando justa causa. Es por ello que se utilizan los criterios establecidos por la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185(a) et seq., puesto que dicho estatuto protege precisamente a los empleados contra despidos injustificados. Soto v. Caribe Hilton, 137 D.P.R. 294, 300 (1994).
El Art. 2 de la Ley Núm. 80, supra, establece lo siguiente, en lo pertinente:

“Se entenderá por justa causa para el despido de un empleado de un establecimiento:

(a) Que el obrero siga un patrón de conducta impropia o desordenada.

No se considerará despido por justa causa aquél que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. ”

29 L.P.R.A. sec. 185b.
Sobre el despido, la apelante testificó:
“Bueno, ese día yo trabajé hasta las nueve de la noche, se que fue un sábado. Una vez salí de mi trabajo, aproximadamente 9:00 en lo que llegué al parking. Eh me dirigía a comprar algo de comer cuando llegue a mi casa, aproximadamente a las 10:00-10:30 sonó el teléfono y era la Sra. Brenda Soltero (apelada), me estaba llamando, a mí me sorprendió mucho a la hora que me estaba llamando y pues la saludo ¿Cómo estás Brenda (apelada)?, No todo bien. Yo le digo: en que te puedo ayudar. Ella me indica: Bueno yo te estoy llamando porque te quiero decir pues que lo vamos a dejar ahí. Yo en ese momento me sentí un poco confundida y le dije que me repitiera porque no entendía de lo que me estaba hablando. Ella me dice pues que lo vamos a dejar ahí y que no vas a trabajar más en el salón. Yo me puso nerviosa y comencé a preguntarle qué razón ella tenía para haberme despedido. Y me indicó que ninguna, que ella no iba hablar de eso en ese momento. Le pregunto a la Sra. Soltero (apelada) si en algún momento, nosotros no hablábamos mucho porque ella nunca hablaba en el salón, si en algún momento yo le había faltado el respeto o la había incomodado alguna actitud mía. Ella me indica que no, que yo era una excelente empleada. Este, le preguntó si yo le había faltado el respeto a alguna dienta o había hecho algo que hubiese incomodado algún cliente. Ella me indicó que no. Que yo era de sus mejores empleadas que de hecho yo le producía más que las empleadas que no estaban embarazadas. ...”. Véase, págs. 34-35 de la Transcripción de la Prueba.
A su vez, apuntó que nunca se le llamó la atención verbal o escrita.
En el contrainterrogatorio declaró que en una ocasión le colocaron una dienta fuera de hora y debió quedarse en el salón durante dos (2) horas. A tales efectos, declaró que la apelada la llamó y le señaló que lo anterior estaba prohibido por el Centro Comercial y que no podía exponerse a ser sancionada por tener el local abierto después de las 9:00 de la noche. (Véase, pág. 46 de la Transcripción de la Prueba.) Testificó que no entendió que lo anterior era que se le estaba llamando la atención.
Sobre las dientas que llegaban sin cita, testificó que en ciertas ocasiones cuando la recepcionista no estaba, se preguntaba a quién le tocaba el turno y la persona cogía a la cliente. Señaló que no existía norma alguna en cuanto al libro de direcciones y teléfonos de las dientas. Declaró que copió los teléfonos de sus dientas, toda vez que la recepcionista le indicó que no tenía tiempo para eso. Testificó sobre “un pequeño incidente” con la recepcionista sobre el cual la apelada habló con ella.
*1187 La testigo Jessica Ramírez, técnica de uñas, trabajó con Creative Concepts, Inc., convicta por un delito de posesión de drogas, declaró que había unas reglas que se debían seguir en el salón. A modo de ejemplo, en el counter de la recepcionista no debían encontrarse las técnicas de uñas y que el libro de citas lo controla la recepción. Sobre los clientes que llegaban sin citas, expresó que le tocaba a la primera técnica que había llegado en la mañana. Atestó que la apelante tuvo problemas con las normas descritas, ya que no seguía el orden establecido. Apuntó que: “ella no esperaba que se le asignara el cliente. Ella se paraba, cogía el cliente y lo llevaba a su mesa. Ella no esperaba que le dijeran: mira, te toca este cliente, lo tienes que atender.” (Véase, pág. 83 de la Transcripción de la Prueba.)
La testigo atestó que la apelante no seguía las normas que habían en el salón, las que seguían las demás. Declaró:
“Porque yo trabaje con ella, porque eso nos afectaba a nosotros porque si ella atendía a los demás clientes que llegaban al salón, obviamente los demás no podían trabajar. O sea, se supone que hay un orden a seguir, entonces nosotras siempre nos quejábamos. Le decíamos a Brenda (apelada) o la persona que estuviera en recepción acerca de la situación....ella hablaba en voz alta, eso afecta el trato del cliente, pues porque ella, a veces utilizaba palabras soeces en voz alta....ella hablaba con otras compañeras y demás, entonces al referirse a ella, pues utilizaba: cabrón, hijo de la gran puta, ese tipo de palabras. ” (Véase, pág. 84 de la Transcripción de la Prueba.)
Declaró que conocía del embarazo de la apelante desde que comenzó a trabajar, toda vez que se le notaba la barriga. A su vez, que todas las personas que laboraban en el salón conocían del mismo, incluyendo a la apelada. (Véase, pág. 101 de la Transcripción de la Prueba.)
Geminuel Medina, técnico de uñas, labora en Creative Concepts. Le llamaban Gema porque en ese momento era transexual. Declaró que existían reglas verbales y escritas y que la apelante, con respecto a las dientas sin cita, no las seguía. La apelante se tomaba la libertad de ir a la recepción; una de las reglas era que los técnicos no podían ir allí. Vio a la apelante acercarse en varias ocasiones a la recepción, cogía clientes sin respetar el tumo de los clientes. Los compañeros tenían conocimiento y se quejaban de ello, ya que afectaba la producción. Declaró:
“Bueno, yo una vez tuve que notificar, a mi jefa Brenda Soltero (apelada), que la había visto a ella tomando los números de la libreta de citas. Esto, o sea, que se metió a la recepción y aparte de entrar a recepción que eso es prohibido, tomaba los números de las dientas y los anotaba en una libreta y yo, pues, tan pronto vi eso lo notifiqué, porque eso no es debido; no es permitido para ninguno. ” (Véase, pág. 104 de la Transcripción de la Prueba.)
Testificó que la apelante le gritaba a las recepcionistas y utilizaba palabras soeces. De él la escuchó decir “mira el maricón este”. (Véase, pág. 105 de la Transcripción de la Prueba.) El le comunicó a sus supervisores lo anterior. Se enteró que estaba embarazada desde que llegó, al igual que todo el mundo. Vio a la apelante copiar nombres del libro de citas, informándoselo a los supervisores.
Jazmín Meléndez González, recepcionista de Creative Concept, Inc., declaró que se enteró del embarazo de la apelante desde el primer día en que empezó a trabajar, a saber, junio de 2005. Declaró que nadie podía pasar a recepción, solamente la recepcionista, nadie tenía acceso al libro y los clientes sin cita se atendían según la llegada de cada técnico. Lo anterior era uso y costumbre. Sobre la apelante señaló que ella se paraba en recepción y cuando llegaba un cliente “rápido, ella lo atacaba y ella le decía yo te puedo atender y se los llevaba a su mesa cuando no podía atenderlo. Cuando no era su turnó. ” (Véase, pág. 121 de la Transcripción de la Prueba.) Atestó que la apelante alteraba su lista lo que ocasionaba que salieran más tarde de las 9:00 de la noche. Esto, ya que al llevarse al cliente, alteraba los restantes turnos. Sobre el comportamiento de la apelante declaró que era grosero, hostil y que habían muchos clientes que no se querían atender con ella porque se pasaba haciendo comentarios. *1188 Atestó que la apelante “se burlaba tanto de los clientes como de los técnicos, de los que trabajamos allí. Se pasaba poniendo nombres y hablando malo.” (Véase, pág. 122 de la Transcripción de la Prueba.) Lo anterior se le señalaba a la apelada constantemente.
Brenda Sotero, la apelada, declaró que es accionista de JB Enterprises y Karval, Inc. administra Creative Concept, Inc., subsidiaria de Karval, Inc. Declaró que la apelante trabajó de marzo a julio de 2005 como técnica de uñas. En el salón trabajaban nueve (9) técnicos incluyendo a la apelante. Le dio a la apelante reglas escritas y verbales. Declaró que la llamaban constantemente para darle quejas, ya que la apelante no seguía las normas establecidas para un buen funcionamiento lo que le traía un conflicto con los demás técnicos. (Véase, pág. 137 de la Transcripción de la Prueba.) Sobre el embarazo, declaró que ha tenido como a cuatro (4) embarazadas, una de ellas por el segundo. Testificó que al adjudicarse las dientas sin cita afectaba el orden del libro de citas. Señaló que la apelante “prefería coger un full set, que el iba a... más dinero, que un retoque de $25.00 dólares. Si hay un walking, ella se tardaba una hora o una hora y media haciendo un full set, entonces sacrificaba la persona citada. Si hay algo que tiene el salón es que las personas que tienen cita se les honra la cita. Lo más que pueden esperar son diez minutos y ella las dejaba esperando. Entonces se extendía su horario.” (Véase, pág. 139 de la Transcripción de la Prueba.) Estuvieron a punto de darle una multa en el malí por la situación. Le dijo por teléfono que no podía volverlo a hacer, pero recurrió.
Atestó que, aunque muchas quejas, la “gota que colmó el vaso” fue lo del listado de clientes.
Por su parte, el Tribunal de Primera Instancia determinó que la prueba desfilada reveló que lo que motivó el despido de la apelante fue un patrón de conducta perniciosa para la buena marcha del negocio. El uso de vocablos ofensivos por parte de la apelante hacia sus compañeros frente al público afectaban la imagen del negocio. Señaló el foro de instancia que lo anterior creaba conflicto y malestar. A su vez, el acaparar los clientes afectaba a los demás compañeros. Entendió que lo anterior, sumado al hecho de que no se presentara prueba alguna de que la empresa hubiese discriminado contra la apelante cuando estaba embarazada y laborando en la misma, justificaba el despido.
Somos de opinión que al examinar la Sentencia, objeto de impugnación, resulta evidente que la apelada descargó a satisfacción del foro apelado el peso de prueba que le correspondía. Por su parte, las determinaciones de hechos realizadas por el Tribunal de Primera Instancia están sostenidas por la prueba presentada.
Examinada la Transcripción de la Vista en su Fondo, surge que la apelante declare» que el día en que cesaron sus funciones con la apelada se le informaron las razones para el despido, a saber un Plan de Reorganización. Incluso atestó que, aunque la apelada entendía que había justa causa para el despido, le dieron una mesada y el pago correspondiente de todas las vacaciones y enfermedad a las que tenía derecho la apelante.
Sobre el período de tomar alimentos, la apelante declaró que lo podía tomar si había tiempo y espacio, toda vez que la compañía era la que pautaban las citas. Testificó al respecto que “se supone que en ese momento ellos tacharan una hora para reservarla para mi período de alimento, lo cual nunca ocurría. ... Bueno, muchas veces tenía que comer a la prisa, me mandaban a buscar comida, entre una dienta y otra coger cinco minutos y comer y seguir.” (Véase, págs. 29-30 de la Transcripción de la Prueba.)
Por otro lado, y contrario a lo alegado por la apelante, el testimonio de Jessica Ramírez fue claro en cuanto a que almorzaban juntas durando dicho almuerzo entre 30 a 40 minutos. (Véase, pág. 85 de la Transcripción de la Prueba.) A su vez, Jazmín Meléndez González testificó que la apelante ingería los alimentos en su mesa y los compraba o los traía de su casa.
Es norma claramente establecida por el Tribunal Supremo de Puerto Rico que en ausencia de error manifiesto, pasión, prejuicio o parcialidad, no se intervendrá a nivel apelativo con las determinaciones de hechos *1189 y adjudicación de credibilidad hecha en instancia por el juzgador de los hechos. Argüello López v. Argüello García, res. el 31 de agosto de 2001, 2001 J.T.S. 127; Trinidad v. Chade, res. el 18 de enero de 2001, 2001 J.T.S. 10; Quiñones v. Manzano, 141 D.P.R. 139 (1996); Orta v. Padilla, 137 D.P.R. 927 (1995); Vélez v. Srio. de Justicia, 115 D.P.R. 529 (1984); Ortiz v. Cruz Pabón, 103 D.P.R. 939 (1975); Rodríguez v. Concreto Mixto, Inc., 98 D.P.R. 579 (1970).
Un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia. Argüello v. Argüello, supra. La determinación de credibilidad del tribunal sentenciador es merecedora de gran deferencia por parte del tribunal apelativo por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada, ya que él fue quien oyó y vio declarar a los testigos. Id.; Pueblo v. Bonilla Romero, 120 D.P.R. 92 (1987). El juez sentenciador, ante quien deponen los testigos, es quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. Argüello v. Argüello, supra.
“[L]a declaración de un testigo no contradicho sobre un hecho determinado, debe merecer crédito, a no ser que su versión sea físicamente imposible, inverosímil o que por su conducta en la silla testifical se haga indigno de crédito”. Miranda Soto v. Mena Eró, 109 D.P.R. 473 (1980); Alicea v. Sucn. F. Gil Rivera, 87 D.P.R. 789 (1963); Villaronga, Com. v. Tribl. de Distrito, 74 D.P.R. 331 (1953).
Aunque, de ordinario, el foro apelativo no interviene con la apreciación de la prueba que hacen los tribunales de instancia, sí lo hace cuando un balance racional, justiciero y jurídico de la totalidad de la prueba y de los documentos que obran en autos lleva a conclusiones distintas a las del tribunal de instancia. Negrón Rivera y Bonilla, Ex Parte, 120 D.P.R. 61 (1987).
Un tribunal apelativo no puede dejar sin efecto una sentencia cuyas conclusiones encuentran apoyo en la prueba desfilada. Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 181 (1985); Pérez v. Hosp. La Concepción, 115 D.P.R. 721, 728 (1984). No obstante, está claro que el arbitrio del juzgador de hechos es respetable, mas no absoluto. Por eso, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. Véase, Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8 (1987); Vélez v. Srio. de Justicia, supra.
Hemos evaluado las determinaciones de hechos realizadas por el Tribunal de Primera Instancia y las mismas están sostenidas por la pmeba desfilada.
V
Por los fundamentos arriba esbozados, se confirma la Sentencia apelada.
Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.
Leda. María E. Pérez Ortiz Secretaria del Tribunal de Apelaciones
ESCOLIOS 2008 DTA 60
1. La apelante alegó que cobró salarios con cheques emitidos por ambas corporaciones, a saber, Creative Concept, Inc. y Kar Val Corp.
2. Se alegó que a la apelante se le adeudaba la cantidad de $8,490.00, desglosada de la siguiente manera: vacaciones, $675.00, días por enfermedad, $675.00, período de alimento, $1,440.00, horas extras, $960.00, y por maternidad, $3,740.00. *1190 A su vez, solicitó daños ascendentes a $20,000.00.
3. Dicha ley prohíbe que se despida, suspenda o discrimine contra un empleado, por razón de sexo, entre otras prohibiciones de discrimen.